R E C E I V E D
CATHY A. CATTERSON, CLERK
U.S. COURT OF APPEALS

FEB 0 5 2009

FILED _____
DOCKETED _____
                DATE        INITIAL

WALTER L. WAGNER
LUIS SANCHO
556 E. 3050 N.
Provo, UT 84604
808 443-6344
lhcdefense@hotmail.com
*Pro se*

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

--oo0oo--

LUIS SANCHO, WALTER L. WAGNER, )

    Plaintiffs-Appellants, )

       V. )

US DEPARTMENT OF ENERGY; )
FERMILAB; CENTER FOR NUCLEAR )
ENERGY RESEARCH, (CERN); )
NATIONAL SCIENCE FOUNDATION )

    Defendant-Appellant )

       V. )

SHELDON GLASHOW; FRANK )
WILCZEK; RICHARD WILSON, )

    Movants. )

No. 08-17389

D.C. No. 1:08-cv-00136-HG-KSC
District of Hawaii, Honolulu
Honorable Helen Gilmor, Judge

**APPELLANTS' OPENING BRIEF**

## APPELLANTS' OPENING BRIEF

John E. Arbab
PO Box 23795
Washington, DC 20026-3795
john.arbab@usdoj.gov

TABLE OF CONTENTS

I.    Table of Contents ............................................................................ 2

II.   Table of Authorities ....................................................................... 3

III.  Jurisdictional Statement .............................................................. 4

      (A)  Basis for the District Court's Subject-Matter Jurisdiction ......................... 4
      (B)  Basis for the Court of Appeals' Jurisdiction ...................................... 4
      (C)  Filing Dates Establishing the Timeliness of the Appeal .......................... 5
      (D)  Assertion that the Appeal is from a Final Order or Judgment ................... 5

IV.   Statement of the Issues Presented for Review .......................................... 5

V.    Statement of the Case ..................................................................... 7

      (A)  Nature of the Case ................................................................... 7
      (B)  Course of Proceedings ............................................................... 10
      (C)  Disposition Below ..................................................................... 13

V.    Statement of Facts Relevant to the Issues Submitted for Review ................... 13

VI.   Summary of the Argument ............................................................... 15

VII.  Argument ........................................................................................ 16

      Appellant's Contentions and Reasons, Standards of Review ....................... 16

VIII. Conclusion ...................................................................................... 23

IX.   Statement of Related Cases ............................................................. 25

II.    <u>Table of Authorities</u>

**Statutory Law**

*National Environmental Policy Act* [NEPA],
      *42 U.S.C. section 4332(2)(c)* ……………………… 4, 5, 6, 7, 8, 10, 12, 15, 21, 23

**Case Law**

*Alaska v. Andrus*, 591 F.2d 537, 540 (9th Cir. 1979) ……………………………..……… 16

*Almond Hill Sch. V. United States Dep't of Agric.*,
      768 F.2d 1030, 1039 (9th Cir. 1985) ………………………………………… 16, 20, 24

*Friends of the Earth, Inc. v. Coleman* 518 F.2d 323 (9th Cir. 1975) …………. 6, 17, 21, 23

*Ka Makani 'O Kohala Ohana, Inc. v. Water Supply*,
      295 F.3d 955 (9th Cir. 2002) ………………………………………… 16, 17, 18, 19, 21

*Rattlesnake Coalition v. U.S. E.P.A.*, 509 F.3d 1095 (9th Cir. 2007) …………… 16, 17, 21

*Ross. v. Fed. Highway Admin.*, 162 F.3d 1046 (10th Cir. 1998) ………………….…….. 18

*Scottsdale Mall v. Indiana*, 549 F.2d 484 (7th Cir. 1977) …………………………….…… 18

III.    <u>Jurisdictional Statement</u>

   (A)    *Basis for the District Court's Subject-Matter Jurisdiction*

The federal government, via defendant-appellee Department of Energy [DOE], etc., has been engaged in funding for the past 11+ years of a machine, the "Large Hadron Collider" [LHC], which is designed to be the world's largest atom-smasher.    Recent considerations of theoretical physics have arisen which show that the use of the machine [which is anticipated to be completed for use in late 2009] could result in the creation of novel forms of matter [e.g. "strangelets", "micro-black-holes", etc.] that could prove environmentally destructive by slowly converting Earth into either a large lump of strange matter, or into a small black hole.

Plaintiffs-appellants contend that the *National Environmental Policy Act* [NEPA] requires that the federal government defendants conduct mandated NEPA hearings, etc. based on these environmental considerations, triggering trial court jurisdiction in this matter due to the failure of the federal government to follow NEPA requirements in this situation.

   (B)    *Basis for the Court of Appeals' Jurisdiction*

The trial court entered a *Final Order* [*Record on Appeal (ROA), Document #92*] erroneously asserting that the involvement of the federal government in the construction of the LHC did not rise to being a "major federal action", a prime NEPA jurisdictional requirement in order to obtain

4

NEPA jurisdiction over the federal government. This *Final Order* was dispositive of all of the issues pending before the trial court.

(C)    *Filing Dates Establishing the Timeliness of the Appeal*

The final order [*Judgment* of dismissal; *Record on Appeal (ROA) Document #92*] by the trial court was dated **September 26, 2008**.

The *Notice of Appeal* [*ROA, Document #96*] was dated **October 20, 2008** and filed within the 30 day requirement of F.R.A.P. 4(a)(1)(A).

(D)    *Assertion that the Appeal is from a Final Order or Judgment*

This appeal is from a Final Order or Judgment that was dispositive of all issues pending before the trial court.

IV.    <u>Statement of the Issues Presented for Review</u>

This case presents a single issue for review – **what constitutes a major federal action** so as to allow triggering of NEPA jurisdictional requirements before the trial court. The facts surrounding this case significantly distinguish it from all prior cases involving a question as to what constitutes a major federal action.

The distinguishing factors surrounding this issue, discussed *infra*, include:

1)    <u>The large Dollar amount</u>  [$531,000,000] spent by the federal government, nearly *forty-fold more than prior cases* that did not constitute major federal actions;

2)    <u>The length of time involved</u> by the federal government in the matter [11+ years to-date, compared to 1-2 years or less for prior actions that did not constitute major federal actions];

3)    <u>The full involvement by the federal government in the project</u>, from *start of planning* to *finalization of construction* and *continuing thereafter*, whereas other actions that did not constitute major federal actions typically entailed involvement by the federal government *only in preliminary phases* such as planning, permitting or siting, with subsequent involvement thereafter solely by the initiating Local or State agency with the federal government bowing out at an early stage;

4)    <u>The federal government is part of the initiator of the project</u>, whereas other actions that did not constitute a major federal action had only a minimal role for the federal government, which did not initiate the projects, but which were instead initiated by State or Local government agencies, with the federal government taking only an auxiliary role incidental to the project;

5)    <u>The control by the federal government</u>, in which it sits in a <u>permanent seat</u> in a lobbying position on the <u>governing agency's board</u>, as well as on oversight boards for the experiments to be performed; whereas in actions that did not constitute a major federal action, the federal role typically had zero control over the projects, which were run entirely by State or County agencies;

6)    <u>The magnitude of the potential environmental impact</u> triggering NEPA, in which in this case the risk issue involves a recognized risk of accidental destruction of the entire planet [maximal impact], whereas in prior cases in which

6

it was determined that the federal involvement was not a major federal action, the NEPA environmental risks were entirely local in effect, and typically involved concerns over parking or highway traffic; and

       7)      <u>The percentage of the Dollar participation in the project is 100%</u>, and **double** *the average amount* of all of the other 20 participating CERN countries [*10%* for the federal government; *5% average* for the 20 CERN countries] when converted from Euros to Dollars, with <u>no</u> Dollars contributed by State, Local or Private sources, with the other monetary commitments instead being Euros from CERN countries.

      The plaintiffs will show how those and other factors readily distinguish this federal project from those others that were deemed minor federal actions, and that this is a <u>major federal action</u> based on the criteria set forth by prior case law.

V.    <u>Statement of the Case</u>

(A)  Nature of the Case

      This case involves the federal government's participation in the funding [$531,000,000+] and construction of the Large Hadron Collider [LHC] machine, located in Geneva, Switzerland, over the course of 11+ years of its development, from its initial design stages, through and until its completion and operation, with continuing involvement planned year-by-year thereafter. No State or Local Government funding has been involved, as is otherwise typical with cases involving a question as to whether the federal funding constituted a major federal action, and the federal Dollars constitute 100% of the Dollar commitment to the project, though there is also Euro commitment from foreign governments.

7

The underlying NEPA issue by which federal jurisdiction is relied upon in the trial court involves the risk issue involved with the operation of the LHC. The risk issue is significant, and it is not contested by the trial court that the trial court would have NEPA jurisdiction if this matter were a major federal action.

The risk issue that is required to be reviewed via NEPA procedures is unique to the purpose of the project, and was not fully appreciated by the project administrators until near the course of completion of construction of the LHC machine. The LHC machine itself is simply a particle accelerator ["atom smasher"], though the largest of its kind ever constructed. It utilizes off-the-shelf technology, but on a massive scale, in an anticipated effort to create the most energetic collisions of atoms ever achieved, once operational in late 2009, in an effort to create physical conditions nowhere else present in the Universe with the hope that novel forms of matter might be made [see *Affidavits* of all seven affiants, *ROA Document #1*].

The difficulty with this new LHC machine, an issue not fully comprehended by the LHC administrators during their safety reviews until only in 2008 when some of the safety issues being raised were partially addressed in a "LSAG Safety Report", is that the machine will both a) create energetic conditions that exist nowhere else in the universe with the possible exception of the interior of collapsing stars that have gone supernova, and b) attempt to create novel forms of matter, including "strange matter" or "strangelets", which are also postulated by theorists to exist in the interiors of collapsed stars.

8

It had been the belief of the LHC administrators that creation of this novel type of matter would be safe, which belief was based on erroneous assumptions since proven to be wrong [see, for example, *Affidavit of Walter L. Wagner*, *ROA Document #1*]. It has since recently been shown that creation of "strangelets", etc. might not be safe, as some respectable physics theories suggest that such material could engage in a 'runaway fusion reaction'[1] which would, over time, slowly convert Earth into a miniature 'strange star' [the term used for the remnant of a supernova, the material that collapses after the star goes supernova, forming a dense ball of strange matter – this was formerly called a neutron star].

Indeed, even the *Amici* who filed an *Amicus Curiae* brief [*ROA, Document #93*] in this matter have not eliminated this possibility, and instead detailed three conditions of unknown physics which must be present in order for "strangelets" to be dangerous. All three conditions they *speculated* were "unlikely" [implying therefore that such is 'very unlikely'][2] to be the nature of physics, and therefore concluding it was reasonable to proceed with the experiment if it were merely 'very unlikely' to result in destruction of our planet [see *Amicus Curiae* brief, *ROA Document #93*].

---

[1] This has also been called an "ice-9 reaction" from the Vonnegut novel involving a fictional material that engages in a runaway transformation of earth's oceans into ice that freezes at room temperature.

[2] The *amici* do not define their term "unlikely". The normal usage is that it means "not likely". An event is "likely" to occur if it has a probability of greater than 50%, and hence "unlikely" means a probability of less than 50%. For example, at the roulette table, if a person places a bet on 'red', the House is likely to win [slightly greater than 50% chance], and the bettor is unlikely to win. We all know, of course, that simply because it is unlikely that the bettor will win his wager, they often times do so. Winning three such unlikely bets in a row could thus be termed "very unlikely" for the bettor to win all three, though of course not impossible.

While plaintiffs-appellants and the seven affiants who filed sworn affidavits in support of the complaint might agree with the *Amici* speculation that those conditions might be "unlikely", they all agree with the exact opposite conclusion to be drawn therefrom:  Merely being "unlikely" or 'very unlikely' that the LHC will create conditions that destroy Earth is *every reason not to proceed with the experiment* unless and until it can be proven to be **impossible** to destroy the Earth, and certainly reason to hold requisite NEPA hearings before the general public for public input as to whether this is a risk to which the general public should be subjected.

The plaintiffs-appellants thus argued to the trial court below that NEPA requirements mandated full public review of these environmental safety issues per NEPA regulations, an argument which the trial court did not dispute, instead erroneously finding that she did not have jurisdiction over such an issue as the federal involvement by defendant-appellee DOE, as their activity in construction of the LHC allegedly did not constitute a "major federal action" as per NEPA requirements.

(B)    Course of Proceedings

On **March 21, 2008** plaintiffs-appellants filed the *Complaint* supported by seven sworn *Affidavits* by affiants Dr. Luis Sancho, Dr. Richard J. Wagner, Dr. Walter L. Wagner, Mr. Mark Leggett, Mr. Rodney J. Skinner, Dr. Paul W. Dixon, and Mr. James R. Blodgett. [*Record on Appeal (ROA), Document #1*].    The complaint itself seeks preliminary and permanent injunctive relief mandating that defendants follow appropriate *National Environmental Policy Act* [NEPA]

procedures, and injunctive relief precluding operation of the LHC until such has been done.

On **June 24, 2008** federal defendants US Department of Energy [DOE], Fermilab, and National Science Foundation [NSF] filed a combined motion to dismiss and motion for summary judgment [*ROA, Document #14*]. Defendants also filed four unsworn declarations by Denis Kovar, Joanna Livengood, Morris Pripstein and Bruce Strauss in support of their motion [*ROA, Documents #17-20*], along with various Attachments thereto.

On **July 1, 2008**, plaintiffs-appellants filed a clerical request entitled "*Request for Entry of Default Against Defendant CERN [Center for Nuclear Energy Research]*" [*ROA, Document #24*]. The Clerk of the court, after examining the court record, on the same day entered its "*Clerk's Entry of Default Against Defendant Center for Nuclear Energy Research (CERN)*" [*ROA, Document #26*].

On **August 5, 2008** plaintiffs-appellants filed a proposed Judgment by default as against defendant CERN only, and a motion seeking a permanent injunction as against defendant CERN [*ROA Documents #28-29*].

On **August 22, 2008**, plaintiffs-appellants filed an opposition to the remaining defendants' combined motion to dismiss and for summary judgment [*ROA, Document #49*]. On that same date, defendants-appellees filed a reply in support of their combined motion to dismiss and for summary judgment [*ROA, Document #48*].

On **August 26, 2008**, plaintiffs-appellants filed a rebuttal to the remaining federal defendants' reply in support of their combined motion to dismiss and for summary judgment [*ROA, Document #52*].

On **August 29, 2008** federal defendants-appellees late-filed another declaration of declarant Bruce P. Strauss [*ROA, Document #66*] in response to the plaintiffs-appellants rebuttal of August 26, 2008, without authorization from the court in violation of Local Rule 7.2(f).

On **September 2, 2008** the court conducted a Hearing on federal defendants-appellees combined motion to dismiss and for summary judgment. The substantive aspect of the then-pending motion was taken under submission.

On **September 26, 2008** the trial court erroneously entered its *Final Order* entitled "*Order Granting Federal Defendants' Motion to Dismiss*" and *Judgment*, erroneously concluding that it lacked jurisdiction after reaching the erroneous conclusion that the federal defendants' participation in the construction of the LHC did not constitute a "major federal action" for NEPA purposes [*ROA, Document #91*; see in particular page 24, bottom of page, which reads: "*Upon analysis of the relevant two factors, the Court concludes that Federal Defendants' involvement with the Large Hadron Collider does not qualify as a 'major Federal action' within the meaning of the National Environmental Policy Act. 42 U.S.C. section 4332(2)(c). As a result, the Court does not have jurisdiction to adjudicate Plaintiffs' claims.*"]

On **September 29, 2008** the *Amici* filed an "*Amended Brief Amicus Curiae [signed]*", notwithstanding the termination of the action three days prior thereto.

On **October 20, 2008** plaintiffs-appellants filed their *Notice of Appeal* [*ROA, Document #96*].

(C)   Disposition Below

The case below was dismissed in its entirety due to the trial court's erroneous conclusion that it lacked jurisdiction based on an erroneous finding that the federal defendants' actions over the course of 11+ years, involving an expenditure of $531,000,000+, did not constitute a "major federal action".

VI.   <u>Statement of Facts Relevant to the Issues Submitted for Review</u>

1.   On December 8, 1997 the federal government entered into an "*International Cooperation Agreement*" ["1997 Agreement"] with co-defendant Center for Nuclear Energy Research [CERN] to build the LHC, and that agreement is presently in place to determine the continuing involvement of the federal government with CERN [see *ROA, Document #20, Strauss Declaration* for a copy of the 1997 Agreement]. The federal government's <u>continuing involvement</u> in the construction and operation of the LHC now <u>exceeds 11+ years</u> since the date of signing of the 1997 Agreement;

2.   The federal government has <u>expended $531,000,000</u> to date on the construction of the LHC, with approximately $70,000,000 budgeted for the 2009 fiscal year, though not yet appropriated [*ROA, Document #20*]

3.   The 1997 Agreement was the initial design-stage for the construction of the LHC, and the federal government has been <u>involved in the design and</u>

13

<u>installation of numerous key components</u> [steering magnets, detectors, etc.] in the construction of the LHC [*ROA, Document #20*] ever since;

4.      The federal government, via the 1997 Agreement, became <u>one of the initiators</u> of the LHC project, which did not exist prior thereto [*ROA, Document #20*];

5.      The federal government sits on a <u>permanent seat with the CERN governing council</u> in a lobbying [though technically 'non-voting'] position, and additionally sits on other boards for the operation of LHC experimental chambers [*ROA, Document #20*, Strauss Declaration including the 1997 Agreement requiring the permanent seat];

6.      Should the "unlikely" scenarios detailed by the *Amici*, which are also detailed by the plaintiffs and the affiants who filed in support, actually come to pass, the <u>environmental destruction would be nothing less than complete destruction of Earth</u> [*ROA, Document #1*, Affidavits of all 7 affiants; see also *Amicus Curiae* brief, *Document #93*, which merely asserts that production of dangerous strangelets is merely "unlikely"]

7.      There are no other sources of US Dollars for the project other than the federal government, which therefore constitutes <u>100% of the US Dollar involvement</u>, though roughly estimated at *10% of the total budget* if the Euro contribution from co-defendant CERN were converted into Dollars. However, CERN is composed of 20 countries, each averaging 5% of the CERN budget [20 X 5% = 100%]. The *US government involvement* at 10% of the CERN budget is therefore *significantly larger than the average of the*

CERN countries at 5% of the CERN budget for each country [*ROA, Document #20*].

VII.    <u>Summary of the Argument</u>

Prior cases in which it was determined that federal involvement in projects was insufficient to trigger the jurisdictional requirements of NEPA set forth various criteria for determining whether the federal involvement in a project met the strict NEPA requirement of being a "major federal action".

The trial court erroneously focused on solely one of those factors, namely the <u>percentage</u> of the project funded by the federal government, and essentially ignored all of the other criteria which clearly show both that the sole factor [percentage of total budget] relied upon by the trial court is not the single determining factor, and that the other factors present show the federal involvement in the construction of the LHC makes it a major federal action within the meaning of NEPA requirements.

This erroneous emphasis on the percentage of the total CERN budget is found in particular in the trial court's "*Order Granting Federal Defendant's Motion To Dismiss*" [*ROA, Document #91*], top of page 20, wherein three cases are cited and their percentage of federal monies as a percentage of the total budget.

In addition, the trial court touched upon one other aspect, namely control over the project, and concluded that since the permanent seat was technically "non-voting", it meant that the federal involvement did not entail adequate control over the project.

VIII.  <u>Argument</u>

      *Appellants Contentions and Reasons, Standards of Review*

         1.    *Federal Expenditure is Very Large Showing Major Federal Action*

      The federal government has expended a large sum for the construction of the LHC over the course of more than a decade.  The amount of money spent by the federal government is approximately DOUBLE the amount spent by each of the other countries involved in the construction project [10% versus 5%], and constitutes 100% of the Dollar commitment to the project [the other commitments were in Euros].  This long-term expenditure commitment dwarfs the expenditures of those cases in which it was found that federal involvement in a project did not constitute a major federal action.

      "There are no clear standards for defining the point at which federal participation transforms a … project into a major federal action. … The matter is simply one of degree."  *Almond Hill Sch. V. United States Dep't of Agric.*, 768 F.2d 1030, 1039 (9th Cir. 1985)

      Significant federal funding can turn what would otherwise be a local project into a "major federal action".  *Alaska v. Andrus*, 591 F.2d 537, 540 (9th Cir. 1979).

      The trial court, however, focused her opinion in support of her erroneous decision by focusing solely on the federal involvement as a *percentage* of the entire project, citing the cases of *Friends of the Earth, Inc. v. Coleman* 518 F.2d 323 (9th Cir. 1975) at **10%**; *Rattlesnake Coalition v. U.S. E.P.A.*, 509 F.3d 1095 (9th Cir. 2007) **at 6%**; and *Ka Makani 'O Kohala Ohana, Inc. v. Water Supply*, 295 F.3d 955 (9th Cir. 2002) at **1.6%** [Page 20 of the court's "Order Granting Federal

Defendants' Motion to Dismiss; *ROA, Document #91*]. However, those cases in terms of total federal dollars disbursed were all relatively small [$14 million in *Friends*; $5 million in *Rattlesnake*; and $30,000 (out of a congressional appropriation of $500,000) in *Ka Makani*.

.    In her Order [*ROA, Document #91*] granting the motion to dismiss and for summary judgment, pages 20-21, she stated:

> "According to Dr. Strauss, the Program Manager in the Office of High Energy Physics, Office of Science, for the United States Department of Energy, Federal Defendants contributed a total of $531 million toward construction of the LHC pursuant to the 1997 Agreement entered into between Federal Defendants and CERN. (Strauss Decl. paragraphs 14, 21, 22)   This expenditure is represented to be less than 10% of the LHC's total construction cost of $5.84 billion. (Id. at paragraph 21)   The applicable caselaw indicates that the funding provided by the United States for the construction of the Large Hadron Collider does not constitute a 'major Federal action' as defined by the National Environmental Policy Act."

Surely, focusing solely on the *percentage* of the total cost of the project, while ignoring the other factors including the huge total expenditure, the extended duration of the project [11+ years and counting], the complete involvement of the federal government from initiation to completion of LHC and then through its continuing operation on a year to year basis, the *requirement* in the 1997 Agreement that the US have a permanent seat on the CERN governing council, and the fact that no one country could financially shoulder the burden of the LHC construction, with the US government shouldering on-average *double* the amount of the other 20 CERN countries, ignores the reasoning in *Friends*, *Rattlesnake*, and *Ka Makani* which allowed those relatively small federal contributions to find against those cases being major federal actions.

Additionally, in the instant case, the federal expenditure to-date is $531 million, with $72 million budgeted by defendant Department of Energy [DOE] for 2009 [*ROA, Document #20*]. This is significantly greater than all three of those other cited cases combined.

It is misleading to examine only the US involvement as a percentage of the total project [after converting the Euro budget into dollars]. The federal government is the <u>only</u> contributor of US *Dollars* [the remaining contribution is in *Euros*], and more importantly, its commitment to-date is <u>twice the average</u>[3] [10% of the total budget, versus 5% average for the CERN countries] of all of the other individual CERN countries participating in construction of the LHC. The US is a significant player in the construction of the LHC, though due to the large-scale nature of the project, no one single country could shoulder the full economic burden of its construction cost.

2.    *Federal Participation is Significant*

In the case of *Ka Makani*, the appellants placed heavy reliance in support of their position on *Scottsdale Mall v. Indiana*, 549 F.2d 484 (7th Cir. 1977) and *Ross. v. Fed. Highway Admin.*, 162 F.3d 1046 (10th Cir. 1998). In *Scottsdale* and *Ross* the projects were conceived of as federal from the outset and had already been subjected to a high degree of federal oversight and control, in allowing those courts to find they constituted major federal actions. However, in *Ka Makani*, federal involvement in the Kohala water project "was restricted to the support and

---

[3] Three CERN countries actually provide a somewhat larger percentage of the total budget than does the US – namely, Germany, France and the UK. The other CERN countries accordingly are at less than the 5% average.

funding of preliminary activities such as the EIS and scientific background studies." *Ka Makani*, 295 F.3d 955, 961. Accordingly, the very low amount of federal funding, coupled with the restriction of the federal effort to merely "preliminary activities" only, properly precluded a finding by the court[4] of a major federal action.

The exact opposite to *Ka Makani* is the case herein. The federal involvement has been significant, from the design, through construction, to intended operation of the LHC. This has involved a long-term commitment of funding in an amount nearly *20,000 times larger* than for *Ka Makani*, for more than 10 years of federal budgeting, with active involvement in all aspects of the project, including scope and design, construction of the LHC and its detectors, and intended operation of the LHC [See Strauss declaration for the scope of the US involvement; *ROA, Document #20*]. This lengthy 11+ year, long-term commitment of federal involvement since the signing of the 1997 Agreement, alone, should serve to make this a major federal action. The huge federal dollar expenditure simply adds to the conclusion that this is a major federal action.

3.  *Federal Control Over the Project*

Still further, the federal involvement includes not merely shoveling federal dollars to a European intergovernmental agency [CERN], and not merely the design and construction of significant major components of the LHC, but also involves retaining a <u>permanent seat</u> on the CERN council as *required* by the 1997 Agreement, albeit a "non-voting" seat. While "non-voting", the permanent seat

---

[4] Ironically, the trial court in *Ka Makani* was the honorable Helen Gilmor.

allows for ready lobbying access to the CERN countries, which lobbying ability is not insignificant when the US financial involvement [10%] is *double* the average CERN country involvements [5%].

If the federal government did not seek to have a voice in control over the project, *it would never have required it to have a permanent seat* on the CERN council as per the 1997 Agreement. Instead, the federal government wanted that control, and not being a member state of CERN, obtained the next best thing, a permanent seat on the governing CERN council, where it could exert considerable lobbying effort.

This contrasts significantly with the situation in *Almond Hill School*, 768 F.2d at 1039, in which the other conditions for finding a major federal action were not present, and the appellants sought to rely instead upon the placement of a federal official for a short-term basis on a State advisory panel, which in turn merely offered recommendations to the California Department of Food and Agriculture, which temporary seat on an advisory panel was insufficient to federalize the project to make it a major federal action. That minimal role for temporary placement of a federal agent on an *advisory* panel did not show any form of federal control over the project. Here, however, the placement is for a <u>permanent seat</u> on the CERN governing council, the controlling council for the entire project.

4.    *Federal Involvement for More Than a Decade*

Still further, in *Friends*, *Rattlesnake*, and *Ka Makani*, the federal involvement was of relatively short duration.  In *Ka Makani* the USGS played an advisory role in the planning of the Kohala project solely because of that agency's expertise and participation in the preliminary research studies, and the USGS was not placed in a decision-making role requiring a lengthy, decade-long involvement in the proposed water project, as is the case herein with the Department of Energy and CERN in the LHC construction.

In *Rattlesnake*, 509 F.3d at 1102, a "local plan does not become a major federal action subject to NEPA regulations *merely upon its approval by a federal agency.  See Friends of the Earth*, 518 F.2d at 328-29.  The development and improvement of sewage treatment by a municipality is intrinsically a local matter under the responsibility of local government.  NEPA does not apply to *an [federal] agency's approval* of a local government's development program ..." [*italics* added for emphasis].  The federal approval action was of short duration, and did not constitute a decade-long involvement of the federal government in that project, as it does in the instant matter.

In *Friends*, 518 F.2d at 327, the federal agency involvement was so minimal in duration that the court stated "we uphold the denial of preliminary relief as to these projects because of the absence of federal participation in the challenged projects."  Again, the federal agency involved [Federal Aviation Administration, FAA] *merely approved an airport layout plan*, and did not involve itself in a decade-long involvement of the FAA with the underlying project.  Once

21

the FAA had completed its short-duration review and approval of the airport layout plan, its role in that airport expansion project was completed.

     5.    *Magnitude of Potential Environmental Impact is Huge*

In the cited cases and others, the alleged environmental impact is only regional in scope in each case, and typically involves concerns regarding vehicular traffic and parking, concerns which might be significant in one sense, but nonetheless which do not affect the majority of the people even in those regions, or if so, more along the lines of nuisance/inconvenience if not properly addressed in the planning.    Other concerns in other cases are actually environmental in nature, but do not involve life-threatening situations, or indeed, threats of extinction of species.

Those cases all contrast sharply with the instant matter, in which it has been proven that there is at least a significant risk[5] of planetary destruction.  While the *Amici* wrote a brief, relied upon by the trial court in her decision, that tends to downplay the risk, that risk nevertheless exists and is of a significantly greater magnitude than for prior cases.  The risk continues to be debated in scientific circles, with two recent science articles[6] coming in the last few days alone which underscores the risk relative to one of the potential disaster scenarios

---

[5] The *Amici* would assert that the risk is minimal ['very unlikely'] and worth taking.  Appellants and their affiants, and other expert witnesses they have lined up to prepare for trial, assert that the risk is sufficiently large that the matter needs to be reviewed via the NEPA process, which includes public hearings so that a cost-benefit analysis could be done to determine whether the public wishes to take that risk in exchange for possibly acquiring some limited basic scientific knowledge not presently known.

[6] http://arxiv.org/abs/0810.5515 [30 October 2008]; http://arxiv.org/abs/0901.2948 [19 January 2009]

[microblackholes], though not treating the strangelet disaster scenario risk, which is arguably the greater risk.

While no prior case law appears to exist relating the potential magnitude of the environmental impact as a deciding criteria as to whether a federal agency's actions constitutes a major federal action, appellants urge this court to recognize that the sheer magnitude of a mistake in this matter itself augers in favor of finding that the DOE's lengthy participation in the LHC construction, and present intent for lengthy continuing participation in its operation[7], constitutes a major federal action for NEPA purposes.

IX.    Conclusion

The trial court erred in examining only the *percentage* of funding by the US government, and the court-surmised 'lack of control' by the federal government in having only "observer" status on the CERN council.    The trial court ignored all of the other important criteria in focusing her decision on those two factors, one of which she additionally misconstrued [construing "observer status" as not having control].

While the 10% funding by the federal government is comparable in *percentage* to the percentage federal involvement in *Friends* [also at 10%], the actual dollar amount spent on the LHC is far, far greater.    Moreover, the federal

---

[7] The unexpected accident at the LHC last September 19, 2008 has left the project in limbo.  The accident was of a severe magnitude, and had not been anticipated in the design.  Attempts at repairs and retrofitting design improvements are reportedly being made, though it is unclear whether such repairs/retrofits would be completed in 2009.  Accordingly, the DOE and all other participants are awaiting repairs/retrofits before they can proceed further.

involvement in the LHC has been a long-term commitment lasting 11+ years [since signing of the 1997 Agreement] whereas in *Friends* the federal involvement had been a one-time review and approval by the FAA of an airport expansion project. The FAA was not involved on a year-by-year basis in that project, as is the DOE in the construction and operation of the LHC. The courts must not look with blinders at that single factor of *percentage*, and must instead examine all factors in determining whether the federal involvement constitutes a major federal action.

Further, the trial court erred in concluding that the permanent federal seat on the CERN council as an "observer" status meant that there was no federal control, comparable to the *Almond Hill School* case in which the federal government placed an agent on an *advisory* board to a State agency, which did not rise to sufficient federal control to warrant a finding of a major federal action. Here, the situation is again entirely different. The federal government was so desirous of obtaining lobbying control of the CERN council that it required obtaining of a permanent seat on the CERN council, required in the 1997 Agreement, albeit by the terms of CERN's constitution, as the US is not a member state of CERN, the federal seat could technically not have cast one of the 20 votes. Indeed, no member state of CERN can 'control' the outcome, because each has merely one vote in 20 votes cast. But by being present for all major discussions over the course of 11+ years, and having tremendous lobbying effort by controlling the significant purse strings of the project over the course of 11+

24

years, the federal government has as much control at the CERN council as any other member state of CERN, if not more due to its larger purse strings.

Finally, the trial court simply ignored the *dicta* of the other cases in which it was found that the federal involvement did constitute a major federal action.  In those cases, a lengthy involvement by the federal government, or an involvement in all major phases of the project and not merely in the preliminary phases only, or an involvement with the federal government as part of the initiator of the project, all resulted in a finding that the federal involvement constituted a major federal action.  So too must the DOE involvement for 11+ years [since signing of the 1997 Agreement], through all phases of development from design, construction, and operation, and including serving as one of the initiators of the project, serve to make the federal involvement in the construction and operation of the LHC a major federal action.

WHEREFORE, it is respectfully requested that this honorable court reverse the clear trial court error below, and remand this matter for further proceedings consistent with a finding that the LHC project is a major federal action.

X.    Statement of Related Cases

There are no related cases pending before the courts.

DATED:      January 31, 2009

_____
Walter L. Wagner


Luis Sancho

WALTER L. WAGNER
LUIS SANCHO
556 E. 3050 N.
Provo, UT 84604
808 443-6344
lhcdefense@hotmail.com
*Pro se*



IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

--ooOoo--

| | |
|---|---|
| LUIS SANCHO, WALTER L. WAGNER, )<br>)<br>　　　Plaintiffs-Appellants, )<br>)<br>　　　V. )<br>)<br>US DEPARTMENT OF ENERGY; )<br>FERMILAB; CENTER FOR NUCLEAR )<br>ENERGY RESEARCH, (CERN); )<br>NATIONAL SCIENCE FOUNDATION )<br>)<br>　　　Defendant-Appellant )<br>)<br>　　　V. )<br>)<br>SHELDON GLASHOW; FRANK )<br>WILCZEK; RICHARD WILSON, )<br>)<br>　　　Movants. )<br>_____ ) | No. 08-17389<br><br>D.C. No. 1:08-cv-00136-HG-KSC<br>District of Hawaii, Honolulu<br>Honorable Helen Gilmor, Judge<br><br><br>**CERTIFICATE OF SERVICE OF<br>APPELLANTS' OPENING BRIEF** |

CERTIFICATE OF SERVICE OF APPELLANTS' OPENING BRIEF

I, Walter L. Wagner, certify that on February 2, 2009 I served the Appellants' Opening Brief on the federal Defendants and on the Movants, and a courtesy copy on the trial court below, by placing 2 copies of same, for each required mailing, in the US mail postage thereon fully prepaid, addressed as follows:

*2 Copies On federal defendants DOE, NSF and Fermilab*:

John E. Arbab
US Department of Justice, Appellate Section
PO Box 23795
Washington, DC  20026-3795

*2 Copies On movants Sheldon Glashow, Frank Wilczek and Richard Wilson*:

Martin S. Kaufman
Atlantic Legal Foundation
2039 Palmer Avenue
Larchmont, NY  10538

*1 Courtesy Copy on the Honorable Helen Gilmor*:

Honorable Helen Gilmor
US District Court
300 Ala Moana Blvd., Room C-338
Honolulu, HI 96850-0338


DATED:  February 2, 2009


Walter L. Wagner