No. 08-17389

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————

LUIS SANCHO and WALTER L. WAGNER,
Plaintiffs-Appellants,

-v.-

UNITED STATES DEPARTMENT OF ENERGY, ET AL.,
Defendants-Appellees

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

———————

**ANSWERING BRIEF OF THE FEDERAL APPELLEES**

———————

JOHN C. CRUDEN
  Acting Assistant Attorney General

DAVID C. SHILTON
JOHN E. ARBAB
  Attorneys, U.S. Department of Justice
  Environment & Natural Resources Div.
  P.O. Box 23795 (L'Enfant Station)
  Washington, DC  20026
  (202) 514-4046

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     A.    Introduction: complaint and disposition below  . . . . . . . . . . . . . . . . . 2

     B.    Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

           1.    a.    Facts bearing on whether there is a continuing,
                       live controversy on appeal with respect to
                       plaintiff Luis Sancho  . . . . . . . . . . . . . . . . . . . . . . . . . . 5

                  b.    Facts bearing on whether plaintiff Walter L. Wagner
                       lacked Article III standing to bring this action
                       in the district court  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

           2.    Facts bearing on whether the LHC is a
               "major Federal action" within the meaning of  NEPA  . . . . . . 7

     C.    Factual Inaccuracies in the Opening Brief . . . . . . . . . . . . . . . . . . . . . 7

     D.    The District Court's Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

i

**Page**

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

I.    A.    THERE IS NO CONTINUING, LIVE CONTROVERSY
            ON APPEAL WITH RESPECT TO LUIS SANCHO . . . . . . 12

      B.    WALTER L. WAGNER LACKED ARTICLE III
            STANDING TO BRING THIS ACTION IN THE
            DISTRICT COURT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      1.    Article III standing requirements . . . . . . . . . . . . . . . . . . . . . 18

      2.    Wagner cannot demonstrate that the alleged injury that
            might potentially result if the LHC is allowed to operate is
            fairly traceable to DOE, and the only entity which can
            redress that alleged injury – CERN – was never made a
            party to the suit by the plaintiffs through proper service
            of the complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      3.    The standing arguments as to causation and redressability
            that Wagner advanced in the district court lack merit . . . . . . 26

      4.    Because Wagner cannot carry his burden of demonstrating
            that he established the causation and redressability
            requirements of Article III standing, this Court need not
            address the injury in fact requirement . . . . . . . . . . . . . . . . . . 31

      5.    Were the Court to reach the question, it should hold that
            the complaint does not satisfy Wagner's burden of
            establishing the requisite injury in fact . . . . . . . . . . . . . . . . 32

II.   EVEN IF WAGNER POSSESSED ARTICLE III STANDING
      TO BRING THIS SUIT, THE DISTRICT COURT
      CORRECTLY CONCLUDED THAT THE LHC IS NOT A
      "MAJOR FEDERAL ACTION" FOR PURPOSES OF NEPA . . . . 42

      A.    NEPA's "major Federal action" requirement . . . . . . . . . . . . 42

      B.    The district court correctly concluded that the LHC is
            not a "major Federal action," where DOE contributed
            less than 10% of the construction cost, and has no control
            over its operation or management . . . . . . . . . . . . . . . . . . . . . 44

ii

**Page**

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

STATEMENT OF RELATED CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

ADDENDUM

# TABLE OF AUTHORITIES

**CASES:**                                                           **Page**

*Alaska v. Andrus,*
    591 F.2d 537 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Arizonans for Official English v. Arizona,*
    520 U.S. 43 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12,17,18

*Ashley Creek Phosphate Co. v. Norton,*
    420 F.3d 934 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 34,35

*Atlanta Coalition on Transp. Crisis, Inc. v. Atlanta Reg'l Comm'n,*
    599 F.2d 1333 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Badasa v. Mukasey,*
    540 F.3d 909 (8th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Cantrell v. City of Long Beach,*
    241 F.3d 674 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Carter v. Commissioner of Internal Revenue,*
    784 F.2d 1006 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*C.E. Pope Equity Trust v. United States,*
    818 F.2d 696 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Daimler Chrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Ecological Rights Foundation v. Pacific Lumber Co.,*
    230 F.3d 1141 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Friends of the Earth, Inc. v. Coleman,*
    518 F.2d 323 (9th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . 44,45,46

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,*
    528 U.S. 167 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Granite Rock Co. v. Int'l Brotherhood of Teamsters, Local 287,*
    546 F.3d 1169 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**CASES (continued):**                                                            **Page**

*Ka Makani 'O Kohala Ohana Inc. v. Water Supply*,
   295 F.3d 955 (9th Cir. 2002) . . . . . . . . . . . . . . . . . 43,44,46,47,51,52

*King v. Atiyeh*,
   814 F.2d 565 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 16,24

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18,25,30,34

*Marbled Murrelet v. Babbitt*,
   83 F.3d 1068 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Mayaguezanos Por La Salud Y El Ambiente v. United States*,
   198 F.3d 297 (1st Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Rattlesnake Coalition v. U.S. E.P.A.*,
   509 F.3d 1095 (9th Cir. 2007) . . . . . . . . . . . . . 19,28,42-46,48,51,52

*Sierra Club v. Penfold*,
   857 F.2d 1307 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Simon v. Eastern Ky. Welfare Rights Organization*,
   426 U.S. 26 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Steel Co. v. Citizens For A Better Environment*,
   523 U.S. 83 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Summers v. Earth Island Institute*,
   129 S. Ct. 1142 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 19,26,33,35

*United States ex rel. Robinson Rancheria Citizens Council v.*
   *Borneo, Inc.*, 971 F.2d 244 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . 36

*Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*,
   435 U.S. 519 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*West Linn Corporate Park L.L.C. v. City of West Linn*,
   534 F.3d 1091 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Whitman v. Mineta*,
   541 F.3d 929 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

v

**CONSTITUTION, TREATY, AND STATUTES**:                                **Page**

U.S. Const.:
Art. III, § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Convention on the Service Abroad of Judicial and Extrajudicial
Documents in Civil or Commercial Matters (Hague Convention)
20 U.S.T. 361, 658 U.N.T.S. 163 (1969):
Art. 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Jurisdiction:
28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,19

28 U.S.C. § 1746 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

National Environmental Policy Act:
42 U.S.C. § 4332(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . 1,4,43,52
42 U.S.C. § 4332(2)(C)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

**RULES AND REGULATIONS:**

40 C.F.R. § 1501.4(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
40 C.F.R. § 1501.4(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Fed. R. App. P.:
Rule 3(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
Rule 4(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Rule 32(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Fed. R. Civ. P.:
Rule 4(f)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
Rule 4(f)(2)(C)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
Rule 4(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
Rule 4(h)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
Rule 11(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
Rule 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

9th Cir. R. 30-1.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**MISCELLANEOUS:**                                                   **Page**

*The American Heritage Dictionary of the English Language*
    (4th ed. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Roberto Casadio, Sergio Fabi & Benjamin Harms,
    *On the Possibility of Catastrophic Black Hole Growth*
    *in the Warped Brane-World Scenario at the LHC*
    (Feb. 17, 2009), http://arXiv.org/abs/0901.2948 . . . . . . . . . . . . . . . 36

Toby Ord, Rafaela Hillerbrand & Anders Sandberg, *Probing the*
    *Improbable: Methodological Challenges for Risks with Low*
    *Probabilities and High Stakes* (Oct.10, 2008),
    http://arXiv.org/abs/0810.5515 . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

R. Jason Richards, *Courting Wikipedia*, 44 Trial 62 (Apr. 2008) . . . . . . . 38

2 Bruno A. Ristau, *International Judicial Assistance* (2000). . . . . . . . . . . 24

vii

## STATEMENT OF JURISDICTION

The district court's jurisdiction rested upon 28 U.S.C. § 1331 (federal question).  The district court entered a judgment on September 26, 2008 dismissing the action.  SER 150 (docket entry 92).[1/]  That judgment is final under 28 U.S.C. § 1291.  A notice of appeal was filed on October 20, 2008.  SER 137. The notice of appeal is timely under Fed. R. App. P. 4(a)(1)(B).  This Court's jurisdiction rests upon 28 U.S.C. § 1291.

However, there is no continuing, live controversy on appeal with respect to plaintiff Luis Sancho; and plaintiff Walter L. Wagner lacked Article III standing to bring this action in the district court.  *See infra*, pp. 12-41.

## STATEMENT OF THE ISSUES

I.     A.  Whether there is a continuing, live controversy on appeal with respect to Luis Sancho.

B.  Whether Walter L. Wagner lacked Article III standing to bring this action in the district court.

II.     Whether, if Wagner possessed Article III standing to bring this action, the district court correctly concluded that the Large Hadron Collider is not a "major Federal action" for purposes of the National Environmental Policy Act, 42 U.S.C. § 4332(2)(C).

———————————————

[1/]     "SER" refers to the Supplemental Excerpts of Record filed by the federal appellees.  Because Luis Sancho and Walter L. Wagner are proceeding without counsel, they are excused from filing excerpts of record.  9th Cir. R. 30-1.2.

1

## STATEMENT OF THE CASE

### A.    Introduction: complaint and disposition below

The focus of this lawsuit is a device known as the Large Hadron Collider or "LHC."  SER 3 (¶ 8).  The LHC is a particle accelerator that straddles the border between France and Switzerland near Geneva, Switzerland.  Situated 100 meters underground, the LHC is designed to collide high-energy beams of subatomic particles traveling around a 27-kilometer ring of superconducting magnets and other structures.  These collisions create more fundamental particles that can be studied for purposes of scientific research.  SER 25 (¶ 6), SER 116-117.

On March 21, 2008, *pro se* plaintiffs Luis Sancho and Walter L. Wagner filed this action in the United States District Court for the District of Hawaii.  SER 1.  As  described by the district court, the suit rests on an allegation that "the collisions [at the LHC] are unsafe and could potentially result in the destruction of the Earth."  SER 117.  For example, the complaint alleges that particle collisions at the LHC could in theory create "a miniature version of a giant black hole," and "[e]ventually, all of earth would fall into such growing micro-black-hole, converting earth into a medium-sized black hole."  SER 4 (¶ 13(b)).

The complaint named as defendants two federal agencies: the United States Department of Energy and the National Science Foundation.  In this answering brief, these agencies are referred to collectively as "DOE" unless otherwise

2

indicated.[2]  The complaint also named as a defendant a non-federal entity: the Conseil Européen pour la Recherche Nucléaire ("CERN"), which the complaint identified in English as the Center for Nuclear Energy Research.  SER 2 (¶ 6).  As the district court stated, CERN is "an intergovernmental European agency that conducts nuclear research."  SER 116.

The complaint alleged, in relevant part, that DOE and CERN "have engaged in a partnership relationship to construct" the LHC; that "[n]o absolute refutation of the adverse scenarios that have been described has yet been articulated"; and that, under the National Environmental Policy Act ("NEPA"), the defendants were required to, and did not, prepare an environmental impact statement ("EIS") for the LHC project.  SER 3, 4-5, 6-7, 9 (¶¶ 8, 14, 16, 18, 22).  In fact, DOE did not prepare an EIS (or any other type of NEPA analysis) for the LHC project.

Alleging that construction of the LHC was nearly finished, the complaint sought a preliminary injunction "enjoining defendants from operating the LHC until after they have completed" an EIS.  SER 3, 11 (¶¶ 8, 26(b)).  Subsequently, on September 10, 2008, the first beam in the LHC was successfully steered around

_____

[2]     The complaint also named "Fermilab" as a defendant.  SER 2 (¶ 4).  However, the record demonstrates that Fermilab (the common name for the Fermi National Accelerator Laboratory) is simply a collection of physical assets (*e.g.*, buildings) owned by the Department of Energy in Batavia, Illinois.  Fermilab is not an agency of the federal government nor is it a legal entity in its own right.  SER 20-21.

the full 27 kilometers of the accelerator.[3]

DOE filed a motion to dismiss the complaint for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1). SER 142 (docket entry 14). DOE's motion contended, *inter alia*, that Sancho and Wagner lacked Article III standing to bring this suit. At a September 2, 2008 hearing on DOE's motion to dismiss, trial counsel for DOE argued, in response to the court's questions, that even if the court had jurisdiction to entertain the suit, on the merits, the LHC is not a "major Federal action" triggering the application of NEPA. SER 99-102. On September 26, 2008, the district court granted DOE's motion, holding that the LHC is not a "major Federal action" for purposes of NEPA, 42 U.S.C. § 4332(2)(C). SER 127-135. In dismissing the action, the court acknowledged, but did not rule on, DOE's contention that Sancho and Wagner lacked standing to bring suit. SER 135. At no juncture did the court issue any injunctive relief against the operation of the LHC.

---

[3]    *See* http://press.web.cern.ch/PressReleases/Releases2008/PR08.08E.html. Other press releases issued by CERN indicate that the following events also took place after the complaint was filed. On September 19, 2008, during commissioning (without beam) of the final sector of the LHC, an incident occurred that resulted in a large helium leak into the tunnel. No one was put at risk by this incident, which investigation determined was caused by a faulty electrical connection between two magnets. On October 21, 2008, the LHC was formally inaugurated. On February 9, 2009, CERN management confirmed a restart schedule, under which first beams in the LHC are expected at the end of September 2009, with collisions following in late October 2009. *See id.* at Releases 2008/PR09.08E.html; *id.* at Releases2008/PR14.08E.html; *id.* at Releases 2008/PR16.08E.html; *id.* at Releases2009/PR02.09E.html (each last visited April 6, 2009). *Cf.* Opening Brief 23 n.7 (referring to an "unexpected accident" at the LHC on September 19, 2008).

4

**B.    Statement of Facts**

*1.    a.    Facts bearing on whether there is a continuing, live controversy on appeal with respect to plaintiff Luis Sancho*

A timely notice of appeal was filed on October 20, 2008.  SER 151 (docket entry 96).  However, the notice of appeal is signed only by plaintiff Walter L. Wagner.  SER 137.  Plaintiff Luis Sancho did not sign the notice of appeal.  While Sancho's name appears in typescript in the upper left-hand corner of the notice of appeal, there is no signature line for Sancho on the document. SER 137.  Although the notice of appeal purports to be filed on behalf of both "Plaintiffs," the district court had previously admonished Sancho and Wagner, on the record, that as a *pro se* litigant, Wagner lacks authority to file legal papers for Sancho.  *See* SER 95-98.

In addition to not signing the notice of appeal, Sancho also did not sign the opening brief filed in this Court on February 5, 2009.  That filing, which purports to be the "Appellants' Opening Brief," is signed (at 25) only by Wagner. A signature line for Sancho appears on the last page of the brief, but that line is blank.

*b.    Facts bearing on whether plaintiff Walter L. Wagner lacked Article III standing to bring this action in the district court*

As noted earlier, this suit rests on an allegation that "the collisions [at the LHC] are unsafe and could potentially result in the destruction of the Earth." SER 117; *see* SER 3-4, 10 (¶¶ 13, 26).  Based on that allegation, the complaint sought a preliminary injunction "enjoining defendants" – *i.e.*, DOE and CERN –

5

"from operating the LHC until after they have completed" an EIS.
SER 11 (¶ 26(b)).

However, the district court found that there was no dispute as to the following facts, which establish that DOE has no authority to prevent the LHC from operating. Under a 1997 "International Cooperation Agreement" entered into between DOE and CERN (hereafter, "1997 Agreement"), the construction, operation, and management of the LHC is "the responsibility of CERN." SER 119, 133. The 1997 Agreement "only gave the United States non-voting 'observer' status in CERN's governing council and no role in financial, policy, or management decisions or operation of the LHC." SER 133. CERN's governing council is "comprised of 20 European countries," *i.e.*, it does not include the United States. SER 133.

Regarding CERN – *i.e.*, the sole entity that possesses authority to prevent the LHC from operating – the record establishes that CERN is not a party to this action because Sancho and Wagner never properly served the complaint on CERN. Sancho and Wagner attempted to serve CERN by hand-delivering a copy of the complaint to its legal department in Geneva, Switzerland. SER 108; *see* SER 110. But the plaintiffs' own process server advised them that this method of service was improper and had been refused by CERN. SER 109. That view was corroborated by the Embassy of Switzerland in Washington, D.C. SER 78. CERN did not enter an appearance in the district court, nor has it entered an appearance in this Court. *See infra*, pp. 21-24.

6

2.    *Facts bearing on whether the LHC is a "major Federal action" within the meaning of  NEPA*

The district court found that there was no dispute as to the following facts regarding whether the LHC is a "major Federal action."  SER 120 (noting the plaintiffs' failure to provide "any substantive written evidence in support of their position").  Pursuant to the 1997 Agreement, DOE contributed a total of $531 million toward the construction of the LHC.  This federal expenditure is less than 10% of the LHC's total construction cost, which is $5.84 billion.  SER 130-131.  In addition, "the United States has minimal control over the LHC project."  SER 133.  Under the 1997 Agreement, the construction, operation, and management of the LHC is "the responsibility of CERN."  SER 133.  The 1997 Agreement "only gave the United States non-voting 'observer' status in CERN's governing council" – which is "comprised of 20 European countries" – and that agreement granted the United States "no role in financial, policy, or management decisions or operation of the LHC."  SER 133.

## C.    Factual Inaccuracies in the Opening Brief

There are numerous material factual inaccuracies in the opening brief's "Course of Proceedings" section and elsewhere in that brief.  We discuss the former set of inaccuracies in this section and address the latter set of inaccuracies as necessary in the Argument section below.

First, the opening brief asserts (at 10) that plaintiffs Luis Sancho and Walter L. Wagner submitted affidavits supporting the complaint in the capacity of

7

persons who hold the title of "Dr." In fact, those affidavits demonstrate that neither plaintiff holds a Ph.D, an M.D., or a similar doctoral degree in any scientific or science-related field. Rather, Sancho's affidavit states that he obtained an "undergraduate degree" in an unspecified field, "followed with my post-graduate studies," also in an unspecified field. SER 17 (¶ 1). Wagner's affidavit states that he obtained a "graduate degree in 1978 . . . in law." SER 12 (¶ 1).

Second, the opening brief asserts (at 11) that DOE's motion to dismiss the complaint was supported by "unsworn" declarations. This assertion ignores that each of the federal government's declarants in this case executed his or her declaration "under penalty of perjury" – as permitted by federal statute. *See* 28 U.S.C. § 1746.

Third, the opening brief asserts (at 12) that certain *amici curiae* filed an amended brief in the district court after it had already "terminat[ed] . . . the action three days prior thereto." In fact, as the court's opinion states, the court issued a minute order granting the *amici* leave to file an amended brief, and the court considered that brief in reaching its decision. SER 115-116. The *amici* below were Professors Sheldon Glashow, Frank Wilczek, and Richard Wilson. Glashow and Wilczek are Nobel Laureates in physics; Wilson holds a chair in physics at

8

Harvard University.  The *amici* brief below states that the plaintiffs' allegations are "not scientifically credible."  SER 144 (docket entry 44, Ex. A at 2, 3, A-i).

Fourth, the opening brief adverts (at 11) to the district court clerk's "entry of default" against CERN.  No default judgment, however, was ever entered against CERN.  Wagner moved for a default judgment, the motion was referred to a magistrate judge, and it was pending when the district court entered judgment dismissing the action.  SER 148, 150 (docket entries 75, 76, & 92).

Fifth, the opening brief asserts (at 13) that "plaintiffs-appellants filed their Notice of Appeal" on October 20, 2008.  However, as discussed in Section B-1-a of the Statement of Facts, *supra*, the notice of appeal is signed only by Wagner, and is not signed by Sancho – notwithstanding that the district court had earlier admonished the plaintiffs on the record that, as a *pro se* litigant, Wagner cannot file legal papers for Sancho.

**D.     The District Court's Decision**

In a September 26, 2008 decision, the district court dismissed this suit, holding that the LHC is not a "major Federal action" for purposes of NEPA. SER 111-136.  The court explained that under Ninth Circuit case law it was required to examine two factors, namely: "(1) the amount and nature of the Federal Defendants' funding, and (2) the extent of the Federal Defendants' involvement

9

and control." SER 128. Applying those factors, the court concluded that "[the] Federal Defendants' involvement with the [LHC] does not qualify as a 'major federal action' within the meaning of [NEPA]." SER 134. As discussed in Section B-2 of the Statement of Facts, *supra*, p. 7, the court found it undisputed that: (1) DOE contributed less than 10% of the LHC's total construction cost; and (2) "the United States has minimal control over the LHC project." SER 130-131, 133. As noted earlier, the court acknowledged, but did not rule on, DOE's contention that Sancho and Wagner lacked Article III standing to bring this suit. SER 135.

## STANDARD OF REVIEW

The district court's grant of a motion to dismiss is reviewed *de novo.  See*, *e.g.*, *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008). This Court may "affirm the district court's dismissal of the claim on any grounds supported by the record, even if the district court did not rely on those grounds." *Granite Rock Co. v. Int'l Brotherhood of Teamsters, Local 287*, 546 F.3d 1169, 1176 n.3 (9th Cir. 2008).

## SUMMARY OF ARGUMENT

I. A. There is no continuing, live controversy on appeal with respect to plaintiff Luis Sancho. By not signing the notice of appeal, and by not signing the

10

opening brief to this Court, Sancho has objectively manifested that he has dropped out of this case at the appellate stage.

B.  The sole originating plaintiff who remains in this appeal – Walter L. Wagner – lacked Article III standing to bring this suit.  The record is clear that the alleged injury – *i.e.*, the potential destruction of the Earth if the LHC is allowed to operate – is not fairly traceable to DOE, because DOE has no authority to determine whether the LHC does or does not operate.  Rather, only CERN possesses that authority.  The record is also clear that a court cannot award Wagner the redress sought in the complaint – *i.e.*, an injunction "enjoining defendants from operating the LHC until after they have completed" an EIS.  CERN, which is the only entity with authority to prevent the LHC from operating, is not a party to this case because the plaintiffs never properly served the complaint on CERN.  Wagner therefore cannot establish the causation and redressability requirements of Article III standing.

Where Wagner clearly cannot establish causation or redressability, this Court need not address whether Wagner established the requisite injury in fact. But if the Court reaches the question, the allegations of the complaint are legally insufficient to establish the requisite injury in fact, because any alleged threat of potential harm posed by the LHC is manifestly not an immediate threat.

11

Moreover, although Wagner states that there is "a significant risk of planetary destruction" if the LHC is allowed to operate, his assertion is purely conjectural. That assertion is based solely on extra-record material, which in any event undermines Wagner's claim; and the assertion is thoroughly discredited on scientific grounds by the record compiled below.

II.  Even if Wagner possessed Article III standing to bring this suit, the district court correctly concluded that the LHC is not a "major Federal action" for purposes of NEPA.  DOE was therefore not required to prepare an EIS (or any other type of NEPA analysis) for the LHC project.  The record clearly demonstrates that DOE contributed less than 10% of the construction cost, and has no control over the operation or management of the LHC.  Under this Court's case law, such minimal federal involvement in the LHC project does not transform it into a "major Federal action."

**ARGUMENT**

## I.    A.    THERE IS NO CONTINUING, LIVE CONTROVERSY ON APPEAL WITH RESPECT TO LUIS SANCHO.

"To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed."  *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) (internal

12

quotation marks omitted). That issue "goes to the Article III jurisdiction" of the federal courts. *Id.* The Article III jurisdictional requirement that there be a continuing, live controversy "at all stages of review" is plainly not met with respect to a plaintiff who has, by any objective measure, dropped out of the case at the appellate stage. Luis Sancho is such a plaintiff.

Sancho's own conduct after judgment was entered in the district court makes it evident that he has dropped out of this case on appeal. As discussed in Section B-1-a of the Statement of Facts, *supra*, p. 5, Sancho did not sign the notice of appeal filed on October 20, 2008 – which is signed only by Walter L. Wagner. Sancho also did not sign the opening brief to this Court filed on February 5, 2009 – which is once again signed only by Wagner. By not signing these legal papers, Sancho has objectively manifested that he is not pursuing an appeal. That objective manifestation is particularly clear in view of the district court's explicit warning to Sancho and Wagner, long before the notice of appeal was filed, that Sancho cannot rely on Wagner to file legal papers for him. *See* SER 95-98.

At a hearing held on September 2, 2008 – *i.e.*, some eight weeks *before* the notice of appeal was filed – Chief Judge Gillmor admonished Sancho and Wagner in no uncertain terms on the record that, as a *pro se* litigant, Wagner lacks authority to file legal papers for Sancho. The court made plain its concern that,

13

prior to the hearing, there had been "no observing of the rules with respect to the fact that, as a pro se litigant, Mr. Wagner, you cannot file for Mr. Sancho." SER 96.  The court even expressed "surprise[ ]" that "Mr. Sancho is here because it does appear that in almost all the filings it is you [*i.e.*, Wagner] who are the moving party."  SER 96.

The court then confirmed that Wagner is not licensed to practice law in any jurisdiction[4]:

> THE COURT: Are you admitted to the bar anywhere, Mr. Wagner?
>
> MR. WAGNER: No, Your Honor.

SER 96.  The court instructed the plaintiffs:  "[A]s a pro se litigant, Mr. Wagner, you cannot file for Mr. Sancho.  *Mr. Sancho has to sign the documents and make them his*."  SER 96 (emphasis added).  The court made it absolutely plain that "you [Wagner] can't represent him," *i.e.*, Sancho, and drove the point home by stressing that it "if Mr. Sancho hasn't signed it . . . it's not going to be treated as coming from Mr. Sancho."  SER 96, 97.

In response to the court's explicit admonitions, Wagner requested "clarification."  Wagner advised the court that Sancho "is living in Spain," which

---

[4]    The court was no doubt aware that, prior to the hearing, Wagner had stated, in an affidavit filed with the complaint, that he obtained a law degree in 1978.  *See supra*, p. 8.

14

"makes it difficult for me to send a document that we both prepared together to Spain, have him sign it and then send it back to me to meet the time requirements." Wagner asked whether it would be "possible for him [*i.e.*, Sancho] to sign the signature page and mail that in." SER 97. The court, however, made it clear that Wagner's proposal was unacceptable, and Wagner so understood:

> THE COURT: Well, Mr. Wagner, what you are doing, basically, is you are attempting to be an attorney without being admitted to the bar; you're attempting to represent a side in this controversy with more than yourself. As far as I'm concerned, *anything that is signed by you and not signed by Mr. Sancho is just your position; it's not Mr. Sancho's position*.
>
> MR. WAGNER: *I'll make certain that all documents in the future have both our signatures when they're filed*, Your Honor. Thank you.

SER 98 (emphasis added). Given the court's express admonitions at the hearing, and Wagner's explicit commitment to the court, Sancho thereafter could not possibly have continued to labor under an erroneous belief that Wagner is free to submit legal papers on his behalf.

Particularly in light of the district court's prior express admonitions, it is clear that Sancho has dropped out of this case on appeal. His subsequent failure to sign either the notice of appeal or the opening appellate brief cannot credibly be explained away as an inadvertent oversight. Moreover, even without express

15

admonitions from a court, it is well-settled that *pro se* litigants must follow "the same rules of procedure that govern other litigants." *King v. Atiyeh*, 814 F.2d 565, 567 (9th Cir. 1987). Various rules that govern litigation in the federal courts amply illustrate the principle that, if *pro se* plaintiff A wishes to join in legal papers filed by *pro se* plaintiff B, then A must sign those papers himself and cannot rely on B's signature as a proxy for his own.[5] These rules implement the well-known general principle that: "Although a non-attorney may appear *in propria persona* in his own behalf, that privilege is personal to him. He has no authority to appear as an attorney for others than himself." *C.E. Pope Equity Trust v. United States*, 818 F.2d 696, 697 (9th Cir. 1987) (citation omitted). *See also Carter v. Commissioner of Internal Revenue*, 784 F.2d 1006, 1008 (9th Cir. 1986) (*pro se* appellants "personally must sign their notices of appeal").

In sum, by not signing the notice of appeal and the opening brief to this Court, even in the face of the district court's express admonitions, Sancho has clearly manifested that he is not pursuing an appeal. Accordingly, insofar as

---

[5] *See* Fed. R. Civ. P. 11(a) ("Every pleading, written motion, and other paper must be signed . . . by a party personally if the party is unrepresented."); Fed. R. App. P. 3(c) ("A pro se notice of appeal is considered filed on behalf of the signer. . . ."); Fed. R. App. P. 32(d) ("Every brief . . . filed with the court must be signed by the party filing the paper. . . ."). That Sancho is not pursuing an appeal is entirely consistent with these rules. Otherwise, Sancho would be giving tacit approval to Wagner's (continued) improper attempt to act as his lawyer.

16

Sancho is concerned there is no continuing, live controversy on appeal. *See*, *e.g.*, *Arizonans for Official English*, 520 U.S. at 59-60, 66-71 (case became moot on appeal when, one day after notice of appeal was filed, plaintiff took another job, where her speech was not governed by the law at issue).

### B.  WALTER L. WAGNER LACKED ARTICLE III STANDING TO BRING THIS ACTION IN THE DISTRICT COURT.

Because there is no continuing, live controversy on appeal with respect to Luis Sancho, the question whether there still exists a party who possessed Article III standing to bring this action must focus upon the sole originating plaintiff who remains in the case at the appellate stage. That plaintiff is Walter L. Wagner. Wagner, however, has wholly failed to carry his burden of demonstrating that he possessed Article III standing to bring this suit. *See Daimler Chrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) (plaintiffs must carry the burden of establishing Article III standing as the party asserting federal jurisdiction). Indeed, Wagner's opening brief to this Court does not even address standing. That omission is particularly glaring given that DOE moved to dismiss this action in the district court on the ground that Sancho and Wagner lacked Article III standing to bring suit. *See supra*, p. 4.

*1.    Article III standing requirements*

Article III, § 2 of the Constitution "confines federal courts to the decision of 'Cases' or 'Controversies.'"  *Arizonans for Official English*, 520 U.S. at 64.  A plaintiff's standing to sue "is an aspect of the case-or-controversy requirement."  *Id.*  To satisfy Article III's standing requirements, a plaintiff must show that:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (discussing *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)).  *See*, *e.g.*, *Cantrell v. City of Long Beach*, 241 F.3d 674, 679 (9th Cir. 2001).

The Supreme Court recently reaffirmed these Article III standing principles in the specific context of cases where, as here, the plaintiff seeks an injunction in a suit alleging that a federal agency has violated a procedural statute (*e.g.*, NEPA):

> To seek injunctive relief, a plaintiff must show that he is
> [1] under threat of suffering "injury in fact" that is concrete
> and particularized; the threat must be actual and imminent, not
> conjectural or hypothetical; [2] it must be fairly traceable to
> the challenged action of the defendant; and [3] it must be
> likely that a favorable judicial decision will prevent or redress
> the injury.

*Summers v. Earth Island Institute*, 129 S. Ct. 1142, 1149 (2009) (bracketed

material added).  *See generally Vt. Yankee Nuclear Power Corp. v. Natural Res.*

*Def. Council, Inc.*, 435 U.S. 519, 558 (1978) (NEPA is a procedural statute and

does not mandate a particular substantive result).[6]

---

[6]    When it dismissed this action, the district court did not rule on DOE's
standing argument because the court believed that its ultimate conclusion – *i.e.*,
that the LHC is not a "major Federal action" for purposes of NEPA – deprived it
of "subject matter jurisdiction" over the action.  SER 135.  While there is some
authority for the court's view (*see Rattlesnake Coalition v. U.S. E.P.A.*, 509 F.3d
1095, 1101 (9th Cir. 2007)), there is also authority for the proposition (which we
believe is the better view) that the "major Federal action" question is a merits issue
(not a jurisdictional issue).  *See Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1073
(9th Cir. 1996).  In this case, the district court's subject matter jurisdiction was
provided by 28 U.S.C. § 1331 because the complaint alleged a claim arising under
federal law (*i.e.*, NEPA).  In any event, the Court need not decide the
characterization issue here.  However the "major Federal action" issue is
characterized, the separate question of Article III standing simply provides this
Court with another ground on which to affirm the judgment below, and it is free to
do so even though the district court did not rely on that ground in dismissing the
case.  *See* Standard of Review, *supra*, p. 10.

2.    *Wagner cannot demonstrate that the alleged injury that might potentially result if the LHC is allowed to operate is fairly traceable to DOE, and the only entity which can redress that alleged injury – CERN – was never made a party to the suit by the plaintiffs through proper service of the complaint.*

The record plainly demonstrates that Wagner cannot carry his burden of establishing his Article III standing to bring this suit because the causation and redressability requirements (*i.e.*, the second and third elements of Article III standing) are not satisfied here.

Regarding causation, the complaint alleged in a nutshell that "the collisions [at the LHC] are unsafe and could potentially result in the destruction of the Earth." SER 117. Based on that allegation, the complaint sought an injunction "enjoining defendants from operating the LHC until after they have completed" an EIS. SER 11 (¶ 26(b)). However, the alleged injury is not fairly traceable to DOE because DOE has no authority to prevent the LHC from operating. For the same reason, insofar as relief against DOE is concerned, the injunction sought by Wagner could not redress his alleged injury because DOE has no role in operating the LHC.

As discussed in Section B-1-b of the Statement of Facts, *supra*, p. 6, the district court found it undisputed that DOE has no authority to prevent the LHC from operating. Under the 1997 Agreement, the construction, operation, and

20

management of the LHC is "the responsibility of CERN." SER 133. The
1997 Agreement "only gave the United States non-voting 'observer' status in
CERN's governing council" – which is "comprised of 20 European countries" –
and that agreement granted the United States "no role in financial, policy, or
management decisions or operation of the LHC." SER 133. In short, the alleged
injury that might potentially result if the LHC is allowed to operate is not fairly
traceable to DOE, because only CERN has authority to decide whether the LHC
does or does not operate.

Regarding redressability, it is equally clear from the record (*see* Section B-
1-b of the Statement of Facts, *supra*, p. 6) that the alleged injury cannot be
redressed by a court because Sancho and Wagner never made CERN a party to the
suit through proper service of the complaint. Most likely for that reason, CERN
did not enter an appearance below, and it has not entered an appearance in this
Court. The record demonstrates that Sancho and Wagner attempted to serve the
complaint on CERN by improper means, and that their own process server told
Sancho and Wagner that their chosen method of service was invalid. Yet the
plaintiffs took no steps to serve CERN properly.

Sancho and Wagner employed a Geneva-based process server named
Marco Breitenmoser to serve the complaint on CERN. In a letter dated June 4,

21

2008, Breitenmoser advised the plaintiffs' Swiss-based representative,

Armin Albarracin, that on May 28, 2008, he (Breitenmoser) had "remitted in

hand" a copy of the complaint "to Mrs. Lucie Barbin at the Legal Department of

the CERN."  SER 108; *see* SER 110.  Then, in a follow-up letter dated July 25,

2008, Breitenmoser advised Albarracin that CERN had rejected service, why it

had done so, and what the proper method of service is.  That letter states, in

relevant part:

> I am again referring to my Record of Service drafted on
> May 28, 2008 at the request of Messrs. Luis Sancho and
> Walter L. Wagner and inform you of the following:
>
> *The CERN has not accepted said Service because* of the
> Headquarters Agreement signed with the Swiss Federal
> Council dated June 11, 1955 that stipulates that the CERN
> shall enjoy the immunities and privileges usually granted to
> international organizations to the extent required for the
> fulfillment of their tasks.
>
> *With respect to International Organizations, all judicial
> documents must be notified through the Swiss Mission*, which
> is the diplomatic channel and therefore the adequate channel
> by which to notify judicial documents.

SER 109 (emphasis added).  However, notwithstanding the explanations of their

own process server, Sancho and Wagner took no steps to remedy their defective

service.  Rather, on August 5, 2008, *i.e.* some ten days *after* Breitenmoser's

follow-up letter, Wagner filed a motion for a default judgment against CERN in

the district court (SER 143 (docket entry 28)), which motion had not been ruled on and thus became moot when the court dismissed the action. *See supra*, p. 9.

The explanation Breitenmoser gave Sancho and Wagner as to the impropriety of their attempted service was corroborated by the Embassy of Switzerland in Washington, D.C. In a letter to the district court dated August 11, 2008, Alexander Wittwer, the Swiss chargé d'affairs, strongly objected to the delivery of the "court documents" at CERN's office "by Mr. Marco Breitenmoser, a Geneva-based bailiff." SER 78. Wittwer stated that "the court documents to be served must be delivered by the United States Embassy in Bern to the Swiss Federal Department of Foreign Affairs (FDFA), which would carry out the service on CERN via our Mission in Geneva." SER 78. Sancho and Wagner, however, did not pursue service by such means.

The Federal Rules of Civil Procedure make clear that the manner in which Sancho and Wagner attempted to serve the complaint on CERN was improper (as Breitenmoser and Wittwer had stated). Rule 4 governs service of process in the district courts, and the only provision that arguably covers service on CERN is Rule 4(h), which specifies the permitted manner of service on an "unincorporated association that is subject to suit under a common name." Fed. R. Civ. P. 4(h). Assuming *arguendo* that CERN is such an entity, Rule 4(h) provides that if (as in

23

this case) service is "at a place not within any judicial district of the United States," then such an entity "*must be served*: * * * in any manner prescribed by Rule 4(f) for serving an individual, *except personal delivery* under (f)(2)(C)(i)." Fed. R. Civ. P. 4(h)(2) (emphasis added).

"[E]xcept personal delivery" under Fed. R. Civ. P. 4(f)(2)(C)(i) means except by "delivering a copy of the summons and of the complaint to the individual personally." However, that was precisely the prohibited manner of service Sancho and Wagner used to serve CERN – *i.e.*, hand-delivery of the complaint to Mrs. Barbin at CERN's legal department in Geneva. SER 108; *see* SER 110. Again, *pro se* litigants must follow "the same rules of procedure that govern other litigants." *King*, 814 F.2d at 567.[7]

---

[7]     In the district court, Wagner argued that personal delivery of the complaint to Mrs. Barbin at CERN was proper under Article 10 of the Hague Convention. SER 148 (docket entry 79 at 5). *See* Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters art. 10, 20 U.S.T. 361, 658 U.N.T.S. 163 (entered into force in the United States Feb. 10, 1969). That argument, if reasserted in a reply brief to this Court, would be meritless. While the Hague Convention in theory might provide a permissible manner of serving an unincorporated association outside the United States (*see* Fed. R. Civ. P. 4(f)(1), 4(h)(2)), Article 10 expressly applies only "[p]rovided the State of destination does not object." 20 U.S.T. 363. Switzerland – "the State of destination" here – ratified the Hague Convention, but expressly declared that it is "opposed to the use in its territory of the methods of transmission provided for in Article[ ] . . . 10." 2 Bruno A. Ristau, *International Judicial Assistance* A-74 (2000). Article 10 is thus inapplicable to this case. And Swiss chargé d'affaires Wittwer's objection to the plaintiffs' attempt to serve CERN was consistent with Switzerland's blanket opposition to Article 10. SER 78.

24

The sum of the matter in regard to Wagner's lack of Article III standing is this: CERN (not DOE) is the sole entity to which the alleged injury – *i.e.*, the possibility that the Earth might eventually be destroyed if the LHC is allowed to operate – is fairly traceable; and the plaintiffs did not make CERN a party to the action through valid service of process.

Accordingly, Wagner lacked Article III standing to bring this suit at all – and most certainly lacked standing to bring this suit *against DOE* – because the alleged injury is fairly traceable solely to the conduct of a non-party; and it is by definition not "likely" that a court could order effective redress against such a third party. *See*, *e.g.*, *Defenders of Wildlife*, 504 U.S. at 560 (alleged injury cannot be the result of "the independent action of some third party not before the court"; and redress by a favorable decision must be "likely," as opposed to merely "speculative") (quoting *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 38, 42, 43 (1976)); *Ecological Rights Foundation v. Pacific Lumber Co.*, 230 F.3d 1141, 1152 (9th Cir. 2000) (causation inquiry does not examine challenged conduct of "some other actor not before the court").

25

3.   *The standing arguments as to causation and redressability that Wagner advanced in the district court lack merit.*

As noted earlier, Wagner's opening brief to this Court does not address whether he  possessed Article III standing to bring this suit, even though DOE specifically challenged the plaintiffs' standing below.  In the district court, however, Wagner did attempt to establish his standing in an opposition to DOE's motion to dismiss.  SER 80-83.[8/]  If Wagner were to reassert those arguments as to causation and redressability in a reply brief to this Court, they would lack merit.

Regarding causation, Wagner argued below that the complaint sufficiently alleges "the actual injury" of plaintiffs' "exclusion from participation in NEPA hearings, etc.," which is "directly traceable to the failure of the government defendants to hold such hearings, etc. as required by law."  SER 81-82.  That causation argument is meritless because it is based on a legally invalid premise.  The premise is that a federal agency's alleged violation of a procedural statute, such as NEPA, standing alone, qualifies as injury in fact for purposes of Article III standing.  However, such a premise is flatly contrary to *Summers*, which holds that the deprivation of "a procedural right *in vacuo*" is "insufficient to create Article III standing."  129 S. Ct. at 1151.

---

[8/]    Although that opposition contended that "Plaintiffs Have Standing," it is signed only by Wagner (and not by Sancho).  SER 86.

26

Regarding redressability, Wagner argued below that "a judicial decision requiring the government defendants to comply with NEPA laws would in fact directly redress plaintiffs' injuries." SER 82. That redressability argument, however, is simply a repackaging of Wagner's contention that Article III standing can be established simply by alleging the deprivation of a procedural right under NEPA. As just discussed, that argument is foreclosed by *Summers*.

Wagner also argued below that "a plaintiff's NEPA claims can be redressed" in this case because there are "extensive funds remaining to be spent in Fiscal Year 2009" by "the government defendants" in connection with the LHC. SER 82. Although he used the term "the government defendants" in making this argument below, Wagner was actually referring only to the Department of Energy. There are several fatal flaws in that redressability argument. First, even assuming *arguendo* that Wagner obtained a favorable decision from this Court on his NEPA claim prior to September 30, 2009 (*i.e.*, by the end of fiscal year 2009), his redressability argument would fail. The relief sought in the complaint is not an injunction prohibiting the Department of Energy *from spending funds* for fiscal year 2009 (or any other fiscal year) in connection with the LHC until it prepares an EIS. Rather, the complaint seeks an injunction prohibiting "[d]efendants" (*i.e.*, the Department of Energy, the National Science Foundation, and CERN) *from*

27

*operating the LHC* until they prepare an EIS.  SER 11 (¶ 26(b)).  However, for the reasons discussed *supra*, pp. 20-25, a court cannot award Wagner that form of redress because the federal agencies have no authority to decide whether the LHC operates or to operate the LHC; only CERN has that authority, and the plaintiffs did not make CERN a party to the suit through valid service of process.[9]

Second, the factual assumption underlying Wagner's redressability argument is simply wrong.  The record clearly establishes that the Department of Energy's funds for fiscal year 2009 in connection with the LHC are directed to supporting United States research projects at the LHC, *not* to supporting the operation of the LHC itself (*i.e.*, the particle colliding process).  Yet Wagner's redressability argument is premised on a court's enjoining the *latter* (factually non-existent) type of funding.  To put the point another way, even if a court were to enjoin the *former* type of funding (which is a form of relief not even sought in the complaint), the LHC would continue to operate.

_____

[9]     The Court is unlikely to have issued mandate in this appeal by September 30, 2009.  Accordingly, even if Wagner were to prevail on his NEPA claim, effective judicial redress is unlikely to be available because, by that point in time, the Department of Energy already will have disbursed any remaining fiscal year 2009 funds.  *See Rattlesnake Coalition v. U.S. E.P.A.*, 509 F.3d 1095, 1103 (9th Cir. 2007) (concluding, in a NEPA suit, that plaintiff's injuries "cannot be redressed now that . . . the federal funds are expended").

28

The factual distinction regarding the use of these fiscal year 2009 funds is made plain in a declaration submitted to the district court by Bruce P. Strauss, an official in the Department of Energy's Office of High Energy Physics, who serves as Associate Program Manager for the LHC Accelerator Construction Project and Program Manager for University, Industrial, and Intergovernmental Grants. SER 88 (¶ 1).[10]  Dr. Strauss explained without contradiction:

> DOE's Office of High Energy Physics plans to provide financial assistance *to scientists from U.S. universities and laboratories to conduct high energy physics research* with the ATLAS and CMS detectors.  The amounts listed for FY 2007, FY 2008, and beyond *are in support of the scientists taking data* on the CMS and ATLAS detectors, as well as for support of next generation accelerator technology that is done domestically.  Although the U.S. and other international and non-federally-financed researchers will conduct experiments, *CERN will be solely responsible for providing, controlling, and scheduling the use of the particle beams necessary for LHC collisions to occur.*

SER 89-90 (¶ 11) (emphasis added).  In short, any ongoing federal funding flows to U.S. scientists, not to CERN.  The redressability argument Wagner raised in the district court fails to recognize this clear factual distinction between the Department of Energy's funding of federal research projects at the LHC, on the

---

[10]    Strauss obtained an Sc.D from the Massachusetts Institute of Technology in 1967.  He has co-authored numerous papers that have been published in peer-reviewed scientific journals, and has many years of experience in the field of particle accelerator construction.  SER 23, 44-45, 47-50.

one hand, and CERN's separate (and sole) responsibility for operating the LHC itself, on the other, *i.e.*, for providing, controlling, and scheduling "the particle beams necessary for LHC collisions to occur." As Dr. Strauss explained: "If U.S. scientists were to be pulled back from the LHC today, this would have no impact on CERN's start of LHC operations. The LHC would still operate without U.S. participation." SER 31 (¶ 27).[11/]

Finally, Wagner summarily asserted below that "the requirements of causation and redressability are 'relaxed' when a plaintiff alleges NEPA claims." SER 83. For the reasons discussed above, however, the requirements of causation and redressability would have to be entirely ignored (not simply "relaxed") for Wagner to establish his Article III standing. While it is true that the plaintiff in a NEPA suit may establish standing "without meeting all the normal standards for redressability" (*Defenders of Wildlife*, 504 U.S. at 572 n.7), redressability assumes, at its irreducible core, that the defendant federal agency in a NEPA suit

---

[11/]    Wagner also relied below (SER 82, 84-85) on a page from the Department of Energy's Fiscal Year 2009 Congressional Budget Request, which Dr. Strauss had attached to one of his declarations. In that budget request, the agency sought approximately $72 million for "Large Hadron Collider Support" in fiscal year 2009. SER 58. As discussed in the text above, Dr. Strauss fully explained the use of those funds. The bottom line is that those funds flow to U.S. scientists, not to CERN; the funds are directed to supporting U.S. research projects at the LHC in fiscal year 2009 – which are not at issue in this case – and not to supporting CERN's operation of the LHC; and the LHC would continue to operate without the participation of U.S.-funded scientists in research projects there.

30

possesses authority and discretion to halt the project at issue – *i.e.*, to halt the project that is alleged to injure or threaten to injure the plaintiff's concrete interests. As the Supreme Court has stated, "the very essence of the redressability requirement" is that the requested relief must remedy the alleged injury. *Steel Co. v. Citizens For A Better Environment*, 523 U.S. 83, 107 (1998). However, the injunctive relief sought in the complaint fails that core redressability requirement because the federal agencies have no authority to halt the operation of the LHC, and the only entity possessing such authority – CERN – is not a party to the action.

4.    *Because Wagner cannot carry his burden of demonstrating that he established the causation and redressability requirements of Article III standing, this Court need not address the injury in fact requirement.*

For the reasons previously discussed, it is clear that Wagner cannot carry his burden of establishing the causation and redressability requirements for Article III standing to bring this suit. It is therefore unnecessary for this Court to address whether Wagner established the requisite injury in fact. *See Steel Co.*, 523 U.S. at 105 (declining to reach injury in fact issue because the complaint failed to establish redressability).

Moreover, the Court should not address the injury in fact question because, as discussed *infra*, pp. 51-53, Wagner's suggestion to the contrary notwithstanding

31

(Brief 23), "the potential magnitude of the environmental impact" is irrelevant as a matter of law in determining whether the LHC is a "major Federal action" for purposes of NEPA.  Accordingly, a ruling from this Court on whether Wagner established the requisite injury in fact for Article III standing purposes would be purely advisory; and of course "federal courts are not permitted to render advisory opinions."  *West Linn Corporate Park L.L.C. v. City of West Linn*, 534 F.3d 1091, 1099 (9th Cir. 2008).

5.    *Were the Court to reach the question, it should hold that the complaint does not satisfy Wagner's burden of establishing the requisite injury in fact.*

If the Court finds it necessary for some reason to address the question, it should conclude, for the reasons outlined in this section, that in the complaint Wagner failed to carry his burden of alleging the requisite injury in fact to establish his Article III standing to bring this suit.  *See Summers*, 129 S. Ct. at 1149.

A.  According to the complaint, if the LHC is allowed to operate, then the Earth could in theory "eventually" be converted into "a single large 'strangelet' of huge size"; or the Earth could in theory "[e]ventually" be converted into "a medium-sized black hole"; or a "runaway reaction" could in theory occur at some unspecified point in the future if "magnetic monopoles" are created.  SER 3-4

32

(¶¶ 13(a), (b), (c)).  Given these allegations, it is conceivable that, in a reply brief to this Court, Wagner might argue that he has established the requisite injury in fact.  The argument might run like this: accepting the complaint's allegations as true, the LHC poses a threat to Wagner's personal interests in Hawaii (where he is a "citizen," SER 2 (¶ 2)), even though the LHC is located thousands of miles away from Hawaii, on the border between France and Switzerland.  That argument, if raised, would lack merit.

Assuming *arguendo* that the threat of injury alleged in the complaint is sufficiently "concrete" for Article III standing purposes, it is clearly not an "imminent" threat of injury, and therefore does not establish the requisite injury in fact.  *Summers*, 129 S. Ct. at 1149.  In ordinary English usage, "imminent" means "[a]bout to occur" or "impending."  *The American Heritage Dictionary of the English Language* 877 (4th ed. 2006).  But a threat of injury that may (or may not) "eventually" materialize, or a threat of injury that may (or may not) occur in "theory" at some unspecified future point in time, cannot reasonably be characterized as an injury that is impending or about to occur.  SER 3-4 (¶¶ 13(a), (b), (c)).

Moreover, as the Supreme Court has explained, although "imminence" is a "somewhat elastic concept," it "cannot be stretched beyond its purpose, which is

33

to ensure that the alleged injury is not too speculative for Article III purposes –

that the injury is *certainly* impending." *Defenders of Wildlife*, 504 U.S. at 564 n.2

(emphasis added by Court; internal quotation marks omitted).  However, a threat

of injury that may (or may not) "eventually" materialize, or a threat of injury that

may (or may not) occur in "theory" at some unspecified future point in time

(SER 3-4 (¶¶ 13(a), (b), (c)) is plainly not a "certainly impending" injury.

504 U.S. at 562 n.2.  While it is true that the plaintiff in a NEPA suit may establish

standing "without meeting all the normal standards for . . . immediacy" (*id.* at 572

n.7), the concept of "immediacy" would have to be ignored altogether for Wagner

to establish his standing.[12]

For similar reasons, the alleged threat of injury is insufficient to confer

Article III standing on Wagner under this Court's framework for analyzing

allegations of "procedural injury" in NEPA suits.  *See Ashley Creek Phosphate*

*Co. v. Norton*, 420 F.3d 934, 937-39 (9th Cir. 2005).  *Ashley Creek* (applying pre-

_____

[12]      This case bears no resemblance to the example of a proposed dam
discussed in footnote 7 of *Defenders of Wildlife*.  The Supreme Court stated that
"one living adjacent to the site for proposed construction of a federally licensed
dam has standing to challenge the licensing agency's failure to prepare an [EIS]
. . . even though the dam will not be completed for many years."  504 U.S. at 572
n.7.  The LHC is plainly not "federally licensed."  Moreover, a proposed dam has a
readily ascertainable expected completion date, and when it becomes operational,
the alleged injury to the plaintiff will occur.  Here, however, it is alleged that the
potential threat of harm posed by the LHC might or might not "eventually" occur,
even *after* it becomes operational.

*Summers* circuit law) inquires "whether it is reasonably probable that the challenged action will threaten the [plaintiff's] concrete interests." *Id.* at 938 n.2. Even under a "reasonably probable" test, however, the complaint does not establish the requisite injury in fact. A threat of injury that may (or may not) "eventually" materialize, or a threat of injury that may (or may not) occur in "theory" at some unspecified future point in time is clearly not a "reasonably probable" threat of injury. SER 3-4 (¶¶ 13(a), (b), (c)).

B. The federal appellees would be content to let the injury in fact question rest here, were it not for Wagner's assertion in the opening brief that, in this case, "it has been proven that there is at least a significant risk of planetary destruction" if the LHC is allowed to operate. Brief 22 (footnote omitted). Although not presented as such, that assertion could be interpreted as a claim by Wagner that he has established the requisite injury in fact for Article III standing. However, if the Court even were to address the injury in fact question, it should do so on the firm understanding that Wagner's assertion about "proven . . . significant risk of planetary destruction" is pure conjecture and has no basis in the record. This assertion therefore cannot establish the requisite injury in fact. *Summers*, 129 S. Ct. at 1149 (threat of injury cannot be "conjectural or hypothetical").

35

Indeed, the opening brief makes no effort to explain how the record in this case supports Wagner's assertion about "proven significant risk." Instead, the opening brief, in a footnote, simply provides a cryptic Internet citation to two papers, both of which (as Wagner states) were posted "in the last few days," *i.e.*, obviously well after the district court entered judgment dismissing this action. Brief 22 & n.6. In other words, the sole citation in support of Wagner's "proven significant risk" assertion is to material that is outside the record of this case. Generally, this Court "will not consider facts outside the record developed before the district court," *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992), and Wagner offers no basis for a departure from that general rule in this case.

Moreover, even a cursory review of the two cited extra-record papers demonstrates that they do not support Wagner's assertion. Rather, one of the cited papers directly contradicts that assertion: in the abstract paragraph at the beginning of the paper, the authors state that, "[b]ased on this analysis, we argue *against* the possibility of catastrophic black hole growth at the LHC."[13] The other

---

[13]    *See* Roberto Casadio, Sergio Fabi & Benjamin Harms, *On the Possibility of Catastrophic Black Hole Growth in the Warped Brane-World Scenario at the LHC* (Feb. 17, 2009), http://arXiv.org/abs/0901.2948, at 1 (last visited April 6, 2009) (emphasis added).

36

cited paper does not even purport to address whether the LHC poses a risk of planetary destruction (much less a "significant risk," as Wagner states): rather, the "basic message" of this paper is that "any scientific risk assessment is only able to give us the probability of a hazard occurring conditioned on the correctness of its main argument" – a completely unremarkable conclusion.[14]

In addition, Wagner's conjectural assertion of "proven significant risk" is thoroughly discredited by scientific evidence in the record compiled below. So as not to unduly belabor a point that is unnecessary for the Court to address in any event, we offer just a few examples.

In an affidavit filed with the complaint, Wagner presented excerpts from a "Wikipedia" article in support of the complaint's allegations. The Wikipedia excerpts discuss two "Safety Concerns" about the LHC. SER 13-14 (¶ 11). One concern is that collisions at the LHC might possibly create "micro black holes," which "might not decay as rapidly as calculated, and accumulate inside the earth and eventually devour it." SER 14. The second concern is based on "a

---

[14]    *See* Toby Ord, Rafaela Hillerbrand & Anders Sandberg, *Probing the Improbable: Methodological Challenges for Risks with Low Probabilities and High Stakes* (submitted Oct. 10, 2008), http://arXiv.org/abs/0810.5515, at 15 (last visited April 6, 2009). To the extent that this paper addresses the LHC at all, it summarily asserts that "[w]hile the arguments for the safety of the LHC are commendable for their thoroughness, they are not infallible" (*id.* at 13) – a claim for which no explanation is offered, and which in any event is not a claim that the LHC poses a "proven significant risk" of planetary destruction (as Wagner states).

hypothetical form of strange matter" known as "strangelets." The excerpt states that "if strangelets can actually exist, and if they were produced at LHC, they could conceivably initiate a runaway fusion process (reminiscent of the fictional ice-nine) in which all the nuclei in the planet were converted to strange matter, similar to a strange star." SER 14.[15]

Assuming *arguendo* that proffering excerpts from a Wikipedia article is a permissible means for a litigant to place (purported) scientific testimony before a federal court,[16] the Wikipedia excerpts themselves do not support Wagner's assertion that the LHC poses a "proven significant risk" of planetary destruction. The Wikipedia excerpts simply offer hypotheses, without any evaluation whatever as to whether there is a scientific basis for the hypotheses.

Moreover, scientific evidence in the record of this case thoroughly discredits the Wikipedia hypotheses. Regarding the "micro black hole" hypothesis, under which such structures could accumulate and "eventually devour" the Earth instead of harmlessly evaporating, Dr. Strauss of the

---

[15]    *See* Brief 9 n.1 (explaining that the term "ice-9 reaction" is from a novel by Kurt Vonnegut "involving fictional material that engages in a runaway transformation of the earth's oceans into ice that freezes at room temperature").

[16]    *But see Badasa v. Mukasey*, 540 F.3d 909, 910 (8th Cir. 2008) ("Since when did a Web site that any Internet surfer can edit become an authoritative source by which . . . experts could provide credible testimony. . . ?") (quoting R. Jason Richards, *Courting Wikipedia*, 44 Trial 62, 62 (Apr. 2008)).

38

Department of Energy's Office of High Energy Physics explained, for instance, that such a concern had been firmly rejected on scientific grounds in a June 2008 safety report for the LHC, known as the "LSAG Report."  SER 33-34 (¶ 31).  The LSAG Report, commissioned by CERN from a group of physicists (*id.*) states, in pertinent part:

> One might nevertheless wonder what would happen if a stable microscopic black hole could be produced at the LHC. However, we reiterate that *this would require a violation of some of the basic principles of quantum mechanics* – which is a cornerstone of the laws of Nature – in order for the black hole decay rate to be suppressed relative to its production rate, *and/or of general relativity* – in order to suppress Hawking radiation.

SER 37-38 (¶ 41) (emphasis added); *see* SER 68.  As Dr. Strauss summed it up in lay terms, "even if hypothetical micro black holes were to be produced at the LHC, the physical laws that govern their hypothetical creation would govern their rapid decay through Hawking radiation"; and "scenarios with stable [micro] black holes . . . would violate basic principles of physics."  SER 91-92 (¶ 21).[17]

---

[17]    Dr. Strauss further noted that the LSAG Report was subsequently reviewed by a five-member panel of the Scientific Policy Committee ("SPC"), which is a 20-member external scientific advisory group composed of "many renowned physicists not affiliated with CERN."  The SPC panel, which included a Nobel Laureate, concluded in its report to CERN: "We fully endorse the conclusions of the LSAG report: there is no basis for any concerns about the consequences of new particles or forms of matter that could possibly be produced at the LHC." SER 34 (¶ 32); *see* SER 74.  As reported in a CERN press release of June 28,

(continued...)

Regarding the Wikipedia excerpts' other hypothesis, *i.e.*, "strangelets" –
which Wagner states is "arguably the greater risk" (Brief 23) – Dr. Strauss
explained, for instance, that even prior to the LSAG Report in 2008, CERN had
commissioned a safety report for the LHC from a group of six European
theoretical physicists "not affiliated with CERN."  This safety report, which issued
in 2003, concluded that "except when making 'totally unrealistic' assumptions, the
data excluded the possibility of creating the 'dangerous' strangelets at the LHC."
SER 33 (¶ 30), SER 35 (¶ 36); *see* SER 63.

Dr. Strauss also noted that this same concern about "strangelets" was
subsequently re-examined in 2008, in the LSAG Report itself.  The LSAG Report
addressed "the hypothetical risk of producing the never-observed strangelets in
light of more recent experimental results from RHIC," *i.e.*, the Relativistic Heavy
Ion Collider at the Department of Energy's Brookhaven National Laboratory in
Upton, New York, which had started operations in 1999.  SER 32 (¶ 28),
SER 35 (¶ 37).  The LSAG Report concluded that "heavy-ion collisions at the
LHC are less likely to produce strangelets than the lower-energy heavy-ion

---

[17]/(...continued)
2008, the SPC panel presented its conclusion to a meeting of the full 20 members
of the SPC, who unanimously approved it.  SER 34 (¶ 32); *see* SER 76-77.
Moreover, on September 5, 2008, the LSAG Report was published in a peer-
reviewed scientific journal.  SER 107 (¶ 3).

collisions already carried out in recent years at the RHIC, just as strangelet production at RHIC was less likely than in previous lower-energy experiments carried out in the 1980s and 1990s." SER 35-36 (¶ 37); *see* SER 69.[18]

In sum, if the Court were even to reach the question, it should conclude that: (1) the allegations of the complaint are legally inadequate to establish the requisite injury in fact, because the alleged threat of potential harm posed by the LHC is manifestly not an immediate threat; and (2) Wagner's purely conjectural assertion about "proven significant risk of planetary destruction" if the LHC operates (a) is based on extra-record material, which in any event undermines Wagner's assertion, and (b) is thoroughly discredited on scientific grounds by the record in this case.

---

[18]    The Wikipedia excerpts offered in Wagner's affidavit do not address the "magnetic monopoles" hypothesis alleged in the complaint. Under that alleged scenario, a magnetic monopole "might have the ability to catalyze the decay of protons and atoms, causing them to convert into other types of matter in a runaway reaction." SER 4 (¶ 13(c)). However, Dr. Strauss noted that the LHC safety report in 2003 had concluded that magnetic monopoles "do not present any conceivable threat," and that the LSAG Report in 2008 pointed out that theories predicting monopoles that catalyze proton decay require monopole masses so large that there is no chance that they will ever be produced at the LHC. SER 38 (¶ 42), SER 38-39 (¶ 43); *see* SER 64.

II.    **EVEN IF WAGNER POSSESSED ARTICLE III STANDING TO BRING THIS SUIT, THE DISTRICT COURT CORRECTLY CONCLUDED THAT THE LHC IS NOT A "MAJOR FEDERAL ACTION" FOR PURPOSES OF NEPA.**

For the reasons discussed above, the judgment below should be affirmed on the ground that Wagner lacked Article III standing to bring this suit. However, if it reaches the issue, the Court should affirm the district court's conclusion that the LHC is not a "major Federal action" for purposes of NEPA. It therefore follows that DOE was not required to prepare an EIS (or any other type of NEPA analysis) for the LHC project.

A.  *NEPA's "major Federal action" requirement*

"To trigger the application of NEPA, an action must be 'federal.'" *Rattlesnake Coalition v. U.S. E.P.A.*, 509 F.3d 1095, 1101 (9th Cir. 2007). That principle is reflected in the text of NEPA, which states in relevant part:

> [A]ll agencies of the Federal Government shall – * * * * include in every recommendation or report on proposals for . . . *major Federal actions* significantly affecting the quality of the human environment, a detailed statement by the responsible official on – the environmental impact of the proposed action.

42 U.S.C. § 4332(2)(C)(i) (emphasis added). As the statutory text makes clear, "the EIS requirement of NEPA" is not "trigger[ed]" unless federal involvement in the project at issue is "sufficiently major to transform it into a 'major Federal

42

action.'" *Ka Makani 'O Kohala Ohana Inc. v. Water Supply*, 295 F.3d 955, 960 (9th Cir. 2002). *See also id.* ("'Congress did not intend NEPA to apply to state, local, or private actions.'") (quoting *Atlanta Coalition on Transp. Crisis, Inc. v. Atlanta Reg'l Comm'n*, 599 F.2d 1333, 1344 (5th Cir. 1979)).[19]

To make that determination, this Court "look[s] to 'the nature of the federal funds used and the extent of federal involvement.'" *Rattlesnake Coalition*, 509 F.3d at 1101 (quoting *Sierra Club v. Penfold*, 857 F.2d 1307, 1314 (9th Cir. 1988)). While "'significant federal funding' can turn what would otherwise be a state or local project into a 'major federal action'" (*Ka Makani*, 295 F.3d at 960 (quoting *Alaska v. Andrus*, 591 F.2d 537, 540 (9th Cir. 1979)), "consideration must be given to a 'great disparity in the expenditures forecast for the state [and county] and federal portions of the *entire* program.'" *Ka Makani*, 295 F.3d at 960

---

[19] As an alternative to an EIS, the complaint also alleged that "[d]efendants" were required to prepare either a "FONSI" or a "FONSI EA" for the LHC project. SER 6 (¶ 18). A federal agency, however, is not required to prepare an "EA" (environmental assessment), "FONSI" (finding of no significant impact), or any other type of NEPA analysis for a project that is not a "major Federal action," such as the LHC. An EA is simply a type of concise analysis that, by regulation, a federal agency may use to determine whether a full-dress EIS should be prepared; and a FONSI is issued by the agency if it determines on the basis of an EA not to prepare an EIS. *See* 40 C.F.R.§ 1501.4(c), (e); *Sierra Club v. Penfold*, 857 F.2d 1307, 1312 (9th Cir. 1988). As the statutory text of NEPA makes clear, however, the question whether an EIS should be prepared does not even arise unless the project is a "major Federal action." *See* 42 U.S.C. § 4332(2)(C); *Ka Makani*, 295 F.3d at 960.

43

(quoting *Friends of the Earth, Inc. v. Coleman*, 518 F.2d 323, 329 (9th Cir. 1975))

(bracketed material as in *Ka Makani*).  *See also Rattlesnake Coalition*, 509 F.3d at

1101.  Moreover, "[f]ederal decisionmakers must also retain power, authority, or

control."  *Id.*  NEPA does not apply if the federal agency is "not placed in a

decisionmaking role."  *Ka Makani*, 295 F.3d at 961 (internal quotation marks

omitted).[20]

B.    *The district court correctly concluded that the LHC is not a "major Federal*
      *action," where DOE contributed less than 10% of the construction cost,*
      *and has no control over its operation or management.*

       In the opening brief, Wagner does not contend that the district court applied

an erroneous legal standard in concluding that the LHC is not a "major Federal

action," nor does he contend that the court erred in finding that the relevant facts

are undisputed.  Rather, Wagner challenges the court's conclusion that the LHC is

not a "major Federal action" by raising a number of factual arguments that are

either contrary to the record, not based on the record, or irrelevant as a matter of

_____

[20]    To the best of the federal appellees' knowledge, this Court has not
addressed whether the principles discussed in the text above also apply where (as
here) the alleged "major Federal action" is an international project situated in a
foreign country.  *Cf. Mayaguezanos Por La Salud Y El Ambiente v. United States*,
198 F.3d 297, 301 (1st  Cir. 1999) (expressing skepticism about an assumption
that "NEPA's 'major federal action' requirement would work in the same fashion
in the domestic and the international contexts," but declining to address the
validity of that assumption).  This answering brief assumes *arguendo* (consistent
with the district court's analysis) that this Court's domestic NEPA case law also
applies to determining whether the LHC is a "major Federal action."

44

law.  Brief 13-25.  We address Wagner's principal arguments *seriatim* below and show that they lack merit.

The district court found that DOE contributed less than 10% of the LHC's total construction cost.   SER 130-131.  This Court "has found that federal funding amounting to just 10% of total estimated expenditures does not federalize a project for purposes of NEPA application." *Rattlesnake Coalition*, 509 F.3d at 1101 (citing *Friends of the Earth*, 518 F.2d 323).  The same conclusion applies here in respect to the LHC.

However, Wagner contends that, notwithstanding the very limited federal funding as a percentage of the total construction cost (less than 10%), the *amount* of DOE's expenditure ($531 million) "[s]how[s] Major Federal Action" because it is allegedly "DOUBLE the amount spent by each of the other countries involved in the construction project."  Brief 16 (capitalization in original); *see also id*. at 18. Wagner, however, cites nothing in the record to support his factual assertion that the amount of DOE's contribution toward the LHC's total construction cost is "double" that of every other country which contributed funds toward the LHC's construction.

Indeed, Wagner's factual assertion is evidently based on nothing more than an arithmetical calculation, which assumes that because CERN is comprised of 20

45

member countries, it must be the case that no single country contributed more than 5% of the LHC's total construction cost. *See* Brief 14-15. That division exercise plainly does not demonstrate that, as a factual matter, each of CERN's 20 member countries contributed an equal amount toward the construction of the LHC, or that no single member country contributed more than a 5% share.

In any event, even accepting *arguendo* Wagner's factual assertion, it is irrelevant as a matter of law. The relevant question in a "major Federal action" analysis is not (as Wagner suggests) whether the amount of the federal expenditure exceeds the expenditure of any single non-federal participant viewed in isolation from the expenditures of all other non-federal participants. Rather, the proper question is whether there is a "'great disparity in the expenditures forecast for the state [and county] and federal portions of the *entire* program.'" *Ka Makani*, 295 F.3d at 960 (quoting *Friends of the Earth, Inc.*, 518 F.2d at 329) (bracketed material as in *Ka Makani*). *See Rattlesnake Coalition*, 509 F.3d at 1101 (stating same principle). Here, there is plainly a "great disparity" between those categories of federal and non-federal expenditures, and that disparity demonstrates that the LHC is not a "major Federal action": DOE contributed less than 10% or $531 million toward construction of the LHC; non-federal contributions accounted for the remaining 90-plus percent of the $5.84 billion total construction cost, or at

46

least $5.256 billion.  SER 130-131.

Wagner also contends that it is germane to the "major Federal action" question that DOE's limited contribution of less than 10% "constitutes 100% of the Dollar commitment to the project (the other commitments were in Euros)." Brief 16.  However, even supposing *arguendo* that the remaining 90-plus percent of the $5.84 billion construction cost was in fact denominated in Euros, that circumstance would again be irrelevant as a matter of law.  On Wagner's reasoning, it would presumably be significant – which it obviously is not – that DOE contributed $1.00 toward the LHC's total construction cost (*i.e.*, 100% of the cost denominated in U.S. dollars) and the remainder of the $5.84 billion was paid by other countries in Euros.  As just discussed, the proper inquiry focuses on the amount of the federal contribution versus all other non-federal contributions to the project.  The proper comparison demonstrates that the LHC is not a "major Federal action" because the federal contribution is less than 10%, and the non-federal contribution is over 90%, of the total construction funding outlay.  *See Ka Makani*, 295 F.3d at 960.

Wagner also refers to the "$72 million budgeted by defendant Department of Energy . . . for 2009," and suggests that this amount, considered in addition to the United States' $531 million contribution toward the LHC's total construction

47

cost in prior years, supports a conclusion that the LHC is a "major Federal action." Brief 18. That suggestion is without merit for several reasons. Even if the $72 million budgeted by the Department of Energy for fiscal year 2009 is added to the total of $531 million spent by that agency and the National Science Foundation in prior years for construction, the total federal expenditure would still be a very minor percentage (10.3%) of the total construction cost of $5.84 billion.

Moreover, as explained *supra*, pp. 28-30, the Department of Energy's budgeting of $72 million in connection with the LHC for fiscal year 2009 is money directed toward support of U.S. research projects at the LHC using the ATLAS and CMS detectors – not toward operation of the LHC itself. Any funds flow to U.S. scientists, not to CERN, which is separately and solely responsible for operating the LHC, *i.e.*, for providing, controlling, and scheduling "the particle beams necessary for LHC collisions to occur." SER 90 (¶ 11). CERN would still operate the LHC even if U.S.-funded scientists did not participate in research projects there. SER 31 (¶ 27). In short, this aspect of federal funding only serves to underscore that the United States does not "retain power, authority, or control" over the LHC, and therefore, that the LHC is not a "major Federal action." *Rattlesnake Coalition*, 509 F.3d at 1101.

48

Wagner further contends that the United States' "lengthy 11+ year, long-term commitment of federal involvement since the signing of the 1997 Agreement" is sufficient, standing alone, "to make this a major federal action."  Brief 19.  But the sole record citation provided by Wagner in support of that contention is a declaration submitted by Dr. Strauss of the Department of Energy's Office of High Energy Physics, and that declaration  refutes Wagner's contention.

Dr. Strauss' declaration demonstrates that the Department of Energy's participation in the LHC is limited to discrete aspects of the overall project under the terms of the 1997 Agreement, namely: (1) spending funds from 1998 through 2005 toward construction of the accelerator itself ($200 million); (2) spending funds from 1998 through 2007 toward construction of the ATLAS and CMS detectors ($250 million), which actually comprise only two of the LHC's four detectors; and (3) providing support for construction of about 2% (38 out of 1,890) of the required superconducting magnets, which is included in the amount referenced in item (1).  SER 27, 28, 29 (¶¶ 14, 18, 20).  That these expenditures on limited aspects of the overall project do not federalize the LHC is further underscored by the fact that, as Dr. Strauss stated, the Department of Energy "completed transfer of title of all [Department of Energy] accelerator components

49

to CERN on September 18, 2007."  SER 30 (¶ 22).[21/]

Wagner also contends that the federal government must actually possess control over the LHC because the United States retains "a permanent seat on the CERN council," which seat, "albeit a 'non-voting' seat," allows the United States "ready lobbying access to the CERN countries."  Brief 19-20 (emphasis in original).  That argument lacks merit for several reasons.  The factual premise of Wagner's argument is contrary to the record, which establishes that the United States does not possess a "permanent seat" on the CERN council.  Rather, the 1997 Agreement provides that the United States "shall become an Observer at the CERN Council."  SER 54 (¶ 7.1).  In other words, the United States has no seat of any kind on the CERN council, but rather, as Dr. Strauss explained, the United States "is permitted to attend Council meetings and to receive Council documents" as a non-voting "observer" nation.  SER 26 (¶ 12).  As the district court correctly found, the 1997 Agreement "only gave the United States non-voting 'observer' status in CERN's governing council and no role in financial,

_____

[21/]    Wagner's repeated assertion (*e.g.*, Brief 6, 19, 25) that the United States was involved in the LHC project at the planning stage is contrary to the record, in particular, to the 1997 Agreement itself.  The agreement states that "on 16 December 1994, the CERN Council approved the Large Hadron Collider (LHC) Project."  SER 53.  That is, the LHC was approved three years prior to the agreement that defines the United States' role in the project, and it was approved by a body – the CERN Council – that does not include the United States in its membership.

policy, or management decisions or operation of the LHC." SER 133.

Moreover, Wagner's speculation about the United States having "ready lobbying access" to the CERN council, even if true, is irrelevant as a matter of law. The relevant question is whether "[f]ederal decisionmakers . . . retain power, authority, or control." *Rattlesnake Coalition*, 509 F.3d at 1101. Even if a federal agency provides advice to a non-federal entity, NEPA does not apply if the federal agency is "not placed in a decisionmaking role." *Ka Makani*, 295 F.3d at 961 (internal quotation marks omitted). The federal government's (purported) ability to "lobby" members of the CERN council is plainly not authority to control decisionmaking on matters relating to the LHC. Indeed, the United States' lack of such authority is made clear by the 1997 Agreement itself; it provides that observer status will allow the United States to "*participate* in all major decisions which will impact the U.S. contributions." SER 54 (¶ 7.1) (emphasis added). That is, even as to important decisions impacting the United States' (limited) monetary contribution to the LHC project, the United States only has authority to "participate in" – not make or control – those decisions.

Finally, Wagner urges this Court to consider "the potential magnitude of the environmental impact" in determining whether the LHC is a "major Federal action." Brief 23. However, Wagner concedes (*id.*) that "no prior case law

51

appears to exist" for that proposition – and there is no sound reason for recognition of such a proposition in a case like this one.  Rather, a project's potential environmental impact (whether small or large) is simply not material to a determination whether the project is "Federal action" for purposes of NEPA, 42 U.S.C. § 4332(2)(C).  "The purpose of NEPA is to bring environmental considerations to the attention of *federal* decision-makers."  *Ka Makani*, 295 F.3d at 960 (internal quotation marks omitted).  Accordingly, as this Court's decisions clearly hold, NEPA is not even triggered unless "[f]ederal decisionmakers . . . retain power, authority, or control" over the project (*Rattlesnake Coalition*, 509 F.3d at 1101), and NEPA does not even apply if the federal agency is "not placed in a decisionmaking role."  *Ka Makani*, 295 F.3d at 961 (internal quotation marks omitted).

However, the "potential magnitude of the environmental impact" of a project (Brief 23) says nothing whatever about that central issue, *i.e.*, whether there exists a federal decision maker with power, authority, or control over the project.  To put the point another way, even if a project may have a large potential environmental impact (which the LHC does not, *see supra*, pp. 35-41), the project is not a "major Federal action" where it does not involve a federal decision maker whose exercise of power, authority, or control over the project would be informed by the preparation of an EIS.  The record is clear that the authority to make decisions concerning construction, operation, and management of the LHC is vested in CERN, not DOE.  SER 133.  Accordingly, the LHC is not a "major

52

Federal action" under settled law, such that DOE was not required to prepare an EIS (or any other type of NEPA analysis) for that project.

## CONCLUSION

For the foregoing reasons, the judgment of the district court dismissing this action should be affirmed.

Respectfully submitted,

JOHN C. CRUDEN
  Acting Assistant Attorney General


DAVID C. SHILTON
s/JOHN E. ARBAB
  Attorneys, U.S. Department of Justice
  Environment & Nat. Resources Div.
  P.O. Box 23795 (L'Enfant Station)
  Washington, DC  20026
  (202) 514-4046

April 6, 2009
90-1-4-12465


## STATEMENT OF RELATED CASES

The federal appellees are not aware of any related cases pending in this Court.

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that the foregoing Brief for the Federal Appellees is proportionately spaced, has a typeface of 14 points, and contains 12,954 words according to WordPerfect 12.

<u>s/John E. Arbab</u>
Attorney, Appellate Section
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 23795 (L'Enfant Station)
Washington, DC 20026
(202) 514-4046

## CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2009, I electronically filed the foregoing Answering Brief of the Federal Appellees with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in this case are not registered CM/ECF users.  I have on April 6, 2009 mailed the foregoing document by First-Class Mail, postage prepaid, to the following non-CM/ECF participants:

Luis Sancho
556 E. 3050 N.
Provo, UT 84604

Walter L. Wagner
556 E. 3050 N.
Provo, UT 84604

Walter L. Wagner
P.O. Box 881
Pepeekeo, HI 96783

s/John E. Arbab
Attorney, Appellate Section
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 23795 (L'Enfant Station)
Washington, DC 20026
(202) 514-4046